## FRED MACEY CO. v. MACEY.

1. Equity—Jurisdiction—Issues of Fact.
   Courts of law are not clothed with the sole power to try issues of fact.

2. Same—Jurisdiction—Fraud.
   Courts of chancery have concurrent jurisdiction with the law courts to grant relief from the consequences of fraud.

3. Cancellation of Instruments—Equity Jurisdiction.
   Courts of chancery are clothed with power to grant relief in the cancellation of instruments, which, until their invalidity is established, may annoy and harass one's business and impair his credit.

4. Same—Bill—Sufficiency of Averments.
   A bill alleged that the promoters of complainant corporation, nominally subscribing for the entire stock, made a secret and burdensome contract in favor of one of them which they claimed to be binding upon the corporation; that the other officers and stockholders of the corporation knew nothing about the contract, but believed that the corporation was receiving complete title to the patents mentioned in it, and that they took the entire property free from any burdens. The bill prayed that defendant be required to repay royalties he had paid himself from the company's funds pursuant to the contract, and that the contract be decreed invalid. *Held*, that the main relief sought was not a decree for money, but relief from a continuing contract, and that chancery had jurisdiction.

5. Corporations—Promoters—Fiduciary Relation.
   The promoters of a corporation are the agents of the corporation and occupy a fiduciary relation to it and its stockholders, and will not be permitted to take a secret advantage of the stockholders.

6. Same—Knowledge of Promoters as Notice to Corporation.
   Knowledge by the three promoters and nominal purchasers of the entire capital stock of a corporation, of a secret agreement, burdensome to the corporation, in favor of one of them, does not bind purchasers of the stock who had no notice of the contract, their purchases of stock not being made from the

promoters as individuals, but from the corporation, its proceeds being intended to create a working capital.

7. CANCELLATION OF INSTRUMENTS — BILL — SUFFICIENCY — SURPLUSAGE—REMOVAL OF CLOUD.

Where a bill by a corporation to cancel a fraudulent contract shows equitable grounds, it is immaterial that it alleges that the contract constitutes a cloud upon complainant's business, and the court is not called upon to decide whether a bill will lie merely to remove a cloud upon one's business.

8. EQUITY—LACHES—DELAY BY NEGOTIATIONS.

Where a corporation protested promptly upon learning of a fraudulent contract made by its promoters, and entered into negotiations for a peaceable settlement, which failed, a bill for cancellation, filed within a reasonable time after such failure, is not barred by laches.

9. SAME—JURISDICTION—FRAUDULENT CONCEALMENT.

Fraudulent concealment is a matter of equitable jurisdiction as well as fraudulent assertion.

Per GRANT, BLAIR, MONTGOMERY, and HOOKER, JJ.

10. EQUITY—JURISDICTION—FRAUD — ABSENCE OF LEGAL REMEDY.

Chancery has jurisdiction in all cases of fraud, where complainant is entitled to relief specifically equitable, and such jurisdiction does not, in all cases, depend upon an absence of legal remedy.

11. CANCELLATION OF INSTRUMENTS—EQUITY JURISDICTION—FRAUD —LEGAL REMEDY.

Where one has obtained an executory writing by fraud, equity has jurisdiction to cancel it, irrespective of the legal redress that the injured party may obtain in an action at law, either as plaintiff or defendant.

Per HOOKER, MCALVAY, and MONTGOMERY, JJ.

Appeal from Kent; Wolcott, J. Submitted October 19, 1905. (Docket No. 78.) Decided March 5, 1906.

Bill by the Fred Macey Company, Limited, against Frank Macey to obtain the cancellation of an agreement for the payment of royalties. From an order overruling a demurrer, defendant appeals. Affirmed.

From a decree overruling the demurrer to the bill in equity in this case, the defendant has appealed. It is im-

portant to state quite fully the allegations of the bill. It states that for about three years prior to April, 1898, Fred Macey had been conducting a business under the style of "The Fred Macey Company," consisting chiefly of selling home and office furniture and supplies by mail. On April 18, 1898, Fred Macey and one Charles W. Matheson formed a copartnership for the purpose of continuing said business under the same name. May 18th following Fred Macey and Matheson made an agreement with the defendant Frank Macey, a brother of Fred. This agreement recited that Frank had invented and applied for letters patent on certain devices for use in card indexes, filing cabinets, and other filing devices, and was desirous of marketing the same. That agreement did not include profit on desks containing filing devices. It provided that each of the parties to the agreement should assign to the respective copartners, share and share alike, all patents that they or either of them then owned or might thereafter acquire, pertaining to card indexes, filing cabinets, and filing devices, and supplies for the same, for the sole use of said copartnership. Each copartner owned one-third of the stock of the copartnership, which was fixed at $75,000. This agreement is set forth at length, but it is unnecessary to refer any further to its provisions.

While the business was thus carried on, certain letters patent and copyrights pertaining to articles and devices handled by the Fred Macey Company were acquired, either by purchase or issue,—some being acquired in the name of Fred Macey, some in the name of Frank, and others in the name of the three jointly. The purchase price thereof was paid by the copartnership. The business had grown, prior to 1901, to considerable proportions, requiring additional capital, and it was then agreed to promote and organize a partnership association, limited, to take over and conduct said business. The capital stock was to be $1,000,000—$600,000 common and $400,000 preferred stock, to bear 6 per cent. interest. It was the intention of the promoters to obtain subscribers for $200,000 of the

preferred stock when the company was organized, and to issue more preferred stock as additional capital might be required. The entire amount of common stock was to be paid for by transferring to the company all of their assets, including machinery, office equipment, mailing lists, contracts for the manufacture of goods, and the patents and copyrights under which they had been manufactured and sold, and the good will of the Fred Macey Company. All debts of the partnership were to be paid by that partnership so that the new company would begin business with no debts. The tangible property of the partnership amounted to about $25,000 in value, of which $14,000 was the value of the machinery, tools, and fixtures, and $11,000 the value of the office fixtures and equipment; the balance of the $600,000 was made up by the transfer of the patents, trade-marks, copyrights, good will, mailing lists, catalogues, and advertising investment.

The promotion of said organization was begun in the latter part of 1900, was completed and the articles of association executed April 19, 1901, and filed under date of May 1, 1901. During that period, through the efforts of Fred and Frank Macey and Charles W. Matheson, $200,000 of the preferred stock was sold. It was the understanding that, in obtaining subscriptions of preferred stock, the promoters would offer and give, as an inducement for such subscriptions, a half share of common stock with every share of preferred stock. Such subscribers were shown a prospectus signed by Fred and Frank Macey and Mr. Matheson. The subscribers and purchasers of stock relied upon the representations made in that prospectus in making their purchases and subscriptions. Said subscribers would not have purchased said stock if they had known of the secret agreement between Fred and Frank Macey and Charles W. Matheson, made April 18, 1901. That agreement is as follows:

"Whereas, the Fred Macey Co., copartnership, composed of Fred Macey and Charles W. Matheson, of the city of Grand Rapids, Mich., are desirous of placing their

present business in the form of a limited copartnership association, organized under the laws of the State of Michigan, and wherein interest in such copartnership association shall be represented by preferred and common stock interests, and in accordance with a certain prospectus, which is hereto attached and which is a part of this agreement.

" And whereas, said Fred Macey Co. are desirous of acquiring the interests of Frank Macey in copartnership agreement known as Macey Bros. & Matheson, and dated May 18, 1898, and also acquiring certain patents and improvements on sectional bookcases, which have not heretofore been covered by any regular agreement.

"And whereas, the Fred Macey Company is desirous of forming a blanket contract agreement with Frank Macey that will be equitable and be a fair exchange in consideration for the cancellation of his interests in the copartnership agreement known as Macey Bros. & Matheson, and also for his interests in his patents on sectional bookcases:

" Now, therefore, it is hereby contracted and agreed by and between said Fred Macey and Charles W. Matheson, known as the Fred Macey Co., parties of the first part, and said Frank Macey, party of the second part, for good and valuable considerations by each to the other in hand paid as follows, to wit:

"1. Said first parties, their heirs, administrators or assigns agree to pay said second party, his heirs, administrators, or assigns, a royalty or consideration of 2 per cent. of the actual net selling price of all filing cabinets, filing devices, whether contained in sectional office furniture or not (except desks), and sectional bookcases, and also supplies for the same, whether embraced by patents or not, sold by said first parties, and such royalty or consideration shall not be less than $3,000 per year, and shall continue for a period of 15 years from May 1, 1901.   And such sums accruing as said royalty or consideration shall be payable semi-annually at the regular preferred stock dividend period of the proposed Fred Macey Co., Ltd., but said royalty or consideration shall not be paid until after the dividends both due and accrued on all outstanding preferred stock have first been paid in full from the profits, and shall not be paid unless the company has earned sufficient profit to pay dividends both due and accrued on outstanding preferred stock.   Any profits re-

maining after dividends due and accrued have been paid on preferred stock, shall be applied first to the payment of said royalty or consideration both due and accrued, and shall be paid before any profits are distributed on outstanding common stock.

"2. The said first parties agree to use all reasonable diligence in marketing the goods covered by this agreement, and to pay all patent expenses relative thereto or relative to any invention of the said second party involved or embraced in this agreement, and said first party shall have the exclusive right to use all improvements made by said second party, whether patented or not.

"3. The said second party agrees to transfer and assign unto said first parties, their heirs, administrators or assigns, all his rights, titles, and interest in the following patents, and subject to the conditions of this contract: [Here follow a list of 20 patents, 19 of which were issued, and one applied for.]

"4. Said second party agrees to assign said first parties or to any party named by them any patents he may secure upon any improvements or that may be secured under his name on any improvements that have been or may be developed by him during the term of his employment with the said first parties, subject to the conditions of this contract, the same to be without pecuniary expense to said second party.

"5. The said second party hereby agrees to do any acts necessary to procure patents, both United States and foreign, on behalf of said first parties, for the benefit of said first parties, the same to be without pecuniary expense to said second party, and to assign to first parties or to their heirs, administrators, or assigns, all such patents while in the employ of first parties, their heirs, administrators, or assigns.

"6. The said first parties agree to keep accurate and complete books of account of all business transacted by them, which shall be open to inspection by said second party at any time, and will make semi-annual reports of all sales, under oath if requested.

"It is agreed that this agreement shall take effect May 1, 1901, and that the interest of Frank Macey in the sales of articles covered by this agreement prior to May 1, 1901, shall be adjusted on a basis of payment to him of 2 per cent. on all sales of sectional bookcases up to and including April 30, 1901, and that the remainder of the articles

sold shall be settled as per special copartnership agreement known as Macey Bros. & Matheson, dated May 18, 1898.

"This contract supersedes all prior agreements between the parties hereto, both verbal and written, and is in lieu thereof, except in event of failure of the Fred Macey Co., Limited, to be duly organized as per the attached prospectus, in which case this contract shall be void and of no effect, and all patents and all rights of interest of Frank Macey contained in agreement of Macey Bros. & Matheson shall be returned to him the same as if this agreement had never been written."

The prospectus stated the business of the company for five years, showing a very large increase. It stated the proposition to form a limited copartnership association in order to take care of the excess of business, stating the stock, etc., as hereinbefore stated. It set forth in glowing terms the prospective business, the prospective profit, and the promise to give a half share of common stock for every share of preferred stock. It contained the following:

"Preferred stock shares are for $100 each, and are entitled to 6 per cent. cumulative annual dividends, dividends payable semi-annually, February 1st, and August 1st.

"The preferred stock has a prior lien over the common stock on the entire net assets of the company, and also on the profits.

"Common stock is entitled to all dividends remaining after 6 per cent. cumulative annual dividends has been paid the preferred stock, and takes second place to the preferred stock in both dividends, and participation in the net assets of the company.

"Subscriptions for the $200,000 of preferred stock offered will be received on or before April 15, 1901, and 10 per cent. of the amount subscribed shall be payable May 1, 1901, and shall be subject to a 10 per cent. payment monthly thereafter until fully paid.

"All subscribers to stock shall be entitled to vote so long as their assessments on subscriptions are fully paid, and shall also be entitled to receive full dividends on their entire stock from the date of their first payment, provided, however, that all assessments made from time to time by the board of directors shall be paid; but in no case shall

the directors ask to exceed 10 per cent. per month on such subscriptions.

" All subscriptions shall be made payable to the Fred Macey Company, Limited; but no subscription shall be binding unless $200,000 of preferred stock shall be subscribed."

After the requisite subscriptions had been obtained for the $200,000 preferred stock, and on April 19, 1901, Fred Macey and Frank, and Mr. Matheson executed the articles of association stating the amount of capital stock held by each—Fred Macey, $200,000 preferred, $450,000 common; Charles W. Matheson, $100,000 preferred, $150,000 common; Frank Macey, $100,000 preferred, no common. It annexed a schedule of property mentioned in the articles. The schedule among its assets mentioned " Entire interest in all copyrights, trade-marks, and applications for copyrights and trade-marks covering the line of merchandise dealt in by the association." The officers selected were three managers—Fred Macey, Charles W. Matheson, and Frank Macey. Chairman, Fred Macey; secretary, Charles W. Matheson; treasurer, Frank Macey.

At the first general meeting of the shareholders, July 25, 1901, a board of five managers was selected, giving their names; that at that meeting a report was made by the chairman, Fred Macey, in the presence of the defendant, Frank, stating the resources and liabilities of the company, among which were the following:

" Patents, trade-marks, copyrights, good will, contracts, organization, and established trade of mail order business of the Fred Macey Company, $465,632.72.

Since the organization $100,000 of the reserved preferred stock has been subscribed, paid for, and issued, and is now held by a large number of stockholders who were ignorant of the contract which is the subject of this litigation. Nearly all of the $600,000 of the common stock has been sold by Fred Macey and Matheson, and such purchasers bought without any knowledge or notice of that contract. Said Frank had general knowledge that Fred Macey and Mr.

Matheson were selling to persons purchasing in good faith with no knowledge or notice of the existence of this contract. About one year after its organization complainant first became aware of the existence of this contract, except in so far as it might be chargeable with notice because the contract was within the knowledge of the individuals originally forming the company, but charges that because of the relations of said three parties to it, notice to these individuals was not notice to the complainant. Said contract was unknown to nearly if not all of its subscribers except the three named. After said contract became known to complainant the defendant claimed, and has continued to claim, that it is obliged to pay said royalty of 2 per cent. specified therein. The articles upon which this royalty is to be paid have constituted more than one-half of its business. The royalties amounted to several thousand dollars each year. In consequence of the knowledge on the part of defendant of the sale and purchase of this stock, under the circumstances, he is estopped in equity from asserting said contract as a liability or debt against complainant. Defendant has been, from the formation of the complainant, and still is, its treasurer, having general charge and custody of its funds. Defendant was formerly in the employ of the complainant on a salary, but is not now actively connected with the business. During the first two years of its existence he drew from its funds the sum of $10,700, claiming that it was due him under this contract, and has refused and still does refuse to account for said moneys, and to return or replace it. Soon after the existence of this contract became known to the other members of the board of managers, and defendant claimed payments under it,— they objected, and various discussions and negotiations were had between the managers and the defendant to prevent litigation and to get complainant relieved from liability under said contract. Such discussions and negotiations continued for nearly two years, but did not result in a final settlement. Defendant claims that payments under such contract are constantly accumulat-

ing as a liability against the complainant. Complainant is in default on its preferred stock. The length of time during which it may be so in default is uncertain, depending upon the success of the business. In consequence, no action for such payments can now be maintained, but defendant threatens to bring suit therefor. The relations between complainant's stockholders and defendant are fiduciary, and it would be unjust and inequitable, therefore, to permit him to enforce the said contract, and as between complainant and defendant there is no consideration for any liability under said contract; said claims and pretentions of the defendant—

" Constitute a serious and continuing cloud upon and injury to your orator's property and business; that the same, if it in fact exists, will continue to accumulate from year to year, without any power on the part of the defendant, Frank Macey, to bring an action at law therefor, unless dividends on the preferred stock are earned and paid; that it may thus accumulate to a very large amount, and to an amount sufficient to seriously injure or to destroy the financial standing and credit of your orator, without any opportunity to determine at law the validity and existence of the same; that the alleged existence of such claim and possible accumulation thereof constitute a cloud against that portion of the assets of your orator represented by the preferred stock, both because its existence and satisfaction may exhaust profits and assets required in future years for the payment of cumulative dividends on the preferred stock, and because it may be claimed to have priority over the preferred stock as to the assets in case of liquidation, and because, as aforesaid, such claim and the accumulation thereof injure and may seriously impair your orator's ability to do business; and that the same constitutes a cloud upon and injury to that portion of your orator's assets represented by the common stock because it is alleged to be prior thereto in all respects for the full term of such contract."

The prayer of the bill is that the defendant may answer under oath that said contract may be adjudged to constitute a cloud upon the complainant's business and assets, that it be canceled and vacated as to complainant; that it

be decreed that said contract created no liability against complainant; that the defendant be enjoined from asserting that said contract creates any claim against complainant; that defendant account for moneys withdrawn under it, and be decreed to return, refund, and pay them over to complainant. To this bill a demurrer was interposed, denying that complainant is entitled to relief for the following reasons:

" 1. That the complainant has not shown that it is a corporation, and entitled to bring the suit in the name of the association.

" 2. That the said bill doth not contain any matter of equity whereon this court can ground any decree or give to the complainant any relief against this defendant.

" 3. That the complainant had a plain, adequate, and complete remedy at law.

" 4. That the claims of the defendant against the complainant, under the contract of date April 18, 1901, do not constitute a cloud upon the complainant's property and business.

" 5. That equitable relief upon an allegation of a cloud upon title is limited to the title to real estate, and does not extend to personal property and business.

" 6. That the complainant has not rescinded, nor offered to rescind the contract of date April 18, 1901.

" 7. That the complainant has retained all the benefits of the contract of date April 18, 1901, and thereby has affirmed its validity.

" 8. That the complainant, by its bill, has not made any title to the relief thereby prayed in respect to the contract of date April 18, 1901.

" 9. That the complainant has shown by its bill that it has been guilty of laches in that it has delayed for the space of two years and over, after full knowledge of the contract of date April 18, 1901."

Complainant was afterwards permitted to amend its bill by inserting four new paragraphs, alleging in substance:

That the full and complete equitable title to the patents, rights to improvements, and inventions specified in paragraph 3 of the contract, was vested in the complainant by a transfer from Fred Macey and Charles W. Matheson, and that the assignment of the same by the defend-

ant was for the purpose of conveying the naked legal title thereto.

That the patents, inventions, and rights were substantially of no value. That their use was long ago abandoned with some technical but no substantial exceptions. That they are of no use to complainant at the present time, and that the money withdrawn by defendant for payments under the contract was many times in actual value of said patents.

That as Fred Macey and Charles W. Matheson transferred these patents and rights to the association, which has paid them for the same by the issue of its common stock, the complainant is under no legal or equitable obligations to return the patents to the defendant, but is willing, and hereby offers, if the court shall think it equitable, to return to the defendant "all and every right, title, or interest in any patent or in any invention conveyed by him directly or individually to the complainant."

That it did not know of the "withdrawals or payments" until the discovery of the contract,—and then protested and refused to permit it further to be carried out. But the allegations of lack of knowledge are intended to allege lack of knowledge by any officer or manager of this complainant except the three individuals who were personally interested therein. But the three individuals were three of the five managers of the company.

The original demurrer was ordered to stand as a demurrer to the amended bill.

*Taggart, Denison & Wilson*, for complainant.

*Crane & Norris*, for defendant.

GRANT, J. (*after stating the facts*). 1. The ground of demurrer most strenuously urged is that complainant has an adequate remedy at law which bars the jurisdiction of the chancery court. It is claimed that to maintain this suit in equity deprives the defendant of his constitutional right to a trial by a jury. The learned counsel for the defendant say that (1) complainant, if sued at law by the defendant, can plead the fraud and invalidity of the contract as a defense, and (2) that he may now bring a suit at law to recover the amount appropriated by the de-

fendant from the complainant.     They have filed an able
and exhaustive brief citing many authorities to sustain
their contention.

Courts of law are not clothed with the sole power to try
issues of fact.     The jurisdiction of the court of chancery
in this State to try cases and grant relief from the conse-
quences of fraud is as old as the jurisprudence of the
State.     In the early case of *Wheeler* v. *Clinton Canal
Bank*, Har. Ch. (Mich.) 449, the court, after holding that
the complainant's remedy at law was difficult and doubt-
ful, said:  " Courts of chancery have also concurrent jur-
isdiction in cases of fraud."     See, also, *Wales* v. *New-
bould*, 9 Mich. •45.     The same principle runs through
many cases from that time to the late case of *Edwards* v.
*Investment Co.*, 132 Mich. 1, in which many authorities
are cited.

Counsel recognize that this case is ruled by *John Han-
cock Mut. Life-Ins. Co.* v. *Dick*, 114 Mich. 337 (43 L.
R. A. 566), and *Mactavish* v. *Kent Circuit Judge*, 122
Mich. 242, and therefore argue strenuously for the over-
ruling of those cases.     They insist that they are overruled
by the later case of *Northwestern Mut. Life-Ins. Co.* v.
*Amos*, 136 Mich. 210, and that the writer of that opinion
failed to distinguish it from those cases.     We may have
failed in distinguishing them, but we were evidently of the
opinion that we did distinguish them.     At all events it is
manifest that there was no intention to overrule the former
cases, but, on the other hand, to approve them.     Our at-
tention is called to no case in which we have cast any
doubt upon the correctness of those decisions.

The concurrent jurisdiction of courts of equity and of
law where relief from fraud is asked, is too firmly estab-
lished in the jurisprudence of this State to be now over-
ruled.     We deem it unnecessary to again travel over the
ground and cite the many authorities upon the subject.
We may, however, state that *Barrows* v. *Doty*, Har. Ch.
(Mich.) 1, and *Teft* v. *Stewart*, 31 Mich. 367, and sim-

ilar cases cited by defendant, have no application to this case.

In *Barrows* v. *Doty* complainant sought relief in chancery from a judgment in a suit at law on two promissory notes, where he might have set up the same facts as a defense upon which he claimed relief in his equity suit.

In *Teft* v. *Stewart* a decree for money alone was asked. Complainant asked no relief as to the instruments upon which the transaction was based.

Courts of chancery, not only in this jurisdiction but in others, are clothed with power to grant relief in the cancellation of instruments which, until their invalidity is determined, may annoy and harass one's business and impair his credit. The language of *New York, etc., R. Co.* v. *Schuyler*, 17 N. Y. 592, is so applicable here that we quote it:

"There is no head of equity jurisdiction more firmly established than that which embraces the cancellation of instruments which are capable of a vexatious use after the means of defense at law may become impaired or lost, or when they are calculated to throw a cloud upon the title or interest of the party seeking relief. * * * Whatever their character, if they are capable of being used as a means of vexation and annoyance, if they throw a cloud upon the title or disturb the tranquil enjoyment of property, then it is against conscience and equity that they should be kept outstanding, and they ought to be canceled. These principles of general jurisprudence are believed to be decisive in favor of the right of this corporation to demand the cancellation of the false stock and to maintain a suit in equity for that purpose."

The bill alleges the existence of an instrument, intended by the parties who made it to bind the corporation. Silence for a long time on the part of the corporation might endanger its rights.

It is undoubtedly true that complainant might bring a suit to recover the money which it alleges the defendant unlawfully took from its treasury. If in that suit the

binding force of this contract upon the complainant were decided, the judgment would undoubtedly determine the rights of the parties for all time; but it is apparent, under the facts alleged in the bill, that that case might be disposed of without deciding the main question here sought to be litigated. The defendant might concede that the conditions had not, in fact, arisen which entitled him to the royalties, and therefore might repay the amount taken before trial. Or the court might dispose of the case on other grounds than the validity of the contract. However this may be, the concurrent remedy in equity lies. The bill alleges in substance that the three promoters of the complainant corporation, nominally subscribing for the entire stock, made a secret and burdensome contract which is claimed to be binding upon the corporation; that other officers and stockholders of the corporation knew nothing about it, but believed that the corporation was buying complete title to these patents, and that they took the entire property free from any burdens. The main relief sought is not a decree for money, but relief from a continuing contract, claimed by defendant to be binding upon the complainant though it was not a party signatory to it. Under the allegations of the bill it will, unless declared inoperative as to the complainant, injure its business and impair its credit.

These promoters occupied a fiduciary relation to the complainant and the other stockholders. 2 Cook on Corporations (5th Ed.), § 651; *Warren* v. *Holbrook*, 95 Mich. 185. They were agents of the corporation, and will not be permitted to take a secret advantage of the other stockholders. *Dickerman* v. *Trust Co.*, 176 U. S. 181.

The knowledge of this contract by the three promoters and subscribers to the capital stock did not bind the purchasers of the stock who had no knowledge thereof. The stock evidently was not sold as their individual property, but as the stock of the corporation, the proceeds of which were to be paid into the treasury as a working capital. The case is one with which a court of equity can most

effectually and may most appropriately deal, and in one suit settle and determine all the questions affecting the rights of the parties.

We think it immaterial that the complainant has alleged this contract to be a cloud upon its business. We need not therefore discuss the question whether a bill will lie merely to remove a cloud upon one's business. The bill does allege that the transaction was a fraud upon complainant and its stockholders who purchased without any knowledge of the transaction—and the facts upon which this fraud is based are stated. These allegations are sufficient to call for an answer and proofs; and the allegation that it is a cloud upon its business may be treated as surplusage.

2. Complainant's cause of action is not under the bill barred by laches. It protested promptly after discovering the fraud, and entered into negotiations for a peaceable settlement, which failed. Under the bill there has been no such failure to assert rights or such lapse of time as will justify the court upon demurrer in holding the complainant guilty of laches. A similar question was raised in *Compo* v. *Jackson Iron Co.*, 49 Mich. 39, where more than 35 years had elapsed since the making of the agreement which was the basis of the suit. The court held that "lapse of time alone will not necessarily operate as a disseisin in law or in equity, and the bill does not indicate any considerable delay since the company gave up negotiating, and denied her rights."

3. Fraud may be consummated by suppression of facts and of the truth, as well as by open false assertions. Fraudulent concealment is a matter of equitable jurisdiction as well as fraudulent assertion. The point, therefore, that no fraudulent representations were made by the defendant to the complainant or its stockholders, is not well taken.

We deem it unnecessary to discuss the other questions presented by the demurrer. The decision of most of the questions may be controlled or affected by the proofs.

The decree is affirmed, with costs, and the case remanded for leave to answer in accordance with the rules and practice of the court.

BLAIR, MONTGOMERY, and HOOKER, JJ., concurred with GRANT, J.

HOOKER, J. I concur in the opinion of my Brother GRANT in this cause.

My understanding of the bill is, that it alleges that the defendant and two former partners, conducting a business, desired to increase the capital employed, and did so by selling preferred stock in a copartnership association, limited. That in selling the stock, of which a large amount was marketed, they made representations at variance with a secret contract, made between themselves, under which the defendant has since claimed, and appropriated royalties, upon the goods manufactured. It is charged, that being treasurer of the company, he has paid himself alleged royalties, to the amount of $10,000 and more, and that he claims that said contract is a valid and subsisting obligation, under and by virtue of which he may hereafter become entitled to royalties upon future business of the concern. The bill prays a cancellation upon the ground of fraud. The defendant demurred, and has appealed from an order overruling the demurrer.

The contention of the defendant's counsel rests upon the proposition, that the complainant has a right to sue for the money heretofore appropriated, in a court of law, and that the decision in that case will settle the questions raised by the bill. I am of the opinion that the well-settled rule in chancery, throughout the country, is that it has jurisdiction in all cases of fraud, where the complainant is entitled to relief specifically equitable, and that it does not in all cases depend upon an absence of legal remedy. Inasmuch as the question has been settled in this State, there is no occasion to cite cases from other courts. In the case of *John Hancock Mut. Life-Ins. Co.* v. *Dick,*

114 Mich. 337 (43 L. R. A. 566), the doctrine was ad-
hered to that an insurance policy, obtained by fraud, might
be the subject of a bill to cancel, notwithstanding the
fact that the company might successfully defend an ac-
tion upon the policy upon the ground of fraud.   In that
case an action at law had been commenced and was re-
strained.   It was shown that a different rule in the Fed-
eral courts rests upon a statute, and the case of *Teft* v.
*Stewart*, 31 Mich. 367, cited and quoted from in the opin-
ion of my Brother GRANT, was commented upon.   The
complainant in that case made two points : (1) That courts
of equity and of law have concurrent jurisdiction in cases
of fraud.   (2) That the former may grant more complete
relief, where an instrument is fraudulently obtained, by
compelling cancellation, or surrender, and other equitable
relief.

The case of *John Hancock Mut. Life-Ins. Co.* v.
*Dick* was followed in a later case, viz., *Mactavish* v.
*Kent Circuit Judge*, 122 Mich. 242.   It was very similar
in its facts to *John Hancock Mut. Life-Ins. Co.*
v. *Dick*, so much so that the opinion said that "the prin-
cipal effort of counsel appears to be directed toward induc-
ing us to overrule the case of *John Hancock Mut. Life-
Ins. Co.* v. *Dick*, etc."   We placed our decision plainly
upon the ground, that where one has obtained an execu-
tory writing by fraud, equity has jurisdiction to cancel it,
and that such jurisdiction is not affected by any legal re-
dress that might be obtained in an action at law whether
it had been already commenced or not.  ·  We said :

   " The question there was not whether it was a hardship
upon the plaintiff to be compelled to try the question of
fraud in equity, rather than before a jury, but—*First,*
whether equity has jurisdiction to cancel a contract ob-
tained by fraud; and, *second,* whether such jurisdiction
is cut off by the institution of a prior action at law upon the
writing.   There is but one answer to these questions.
The jurisdiction of equity for cancellation is well settled,
and courts cannot curtail such jurisdiction because the
same evidence that would justify a decree of cancellation

may constitute a defense to an action upon the instrument. The authority to restrain the pending action at law is based upon the equitable jurisdiction to prevent a multiplicity of suits, and this is as well established as any other jurisdiction of equity. Then, the fraternal society had a right to sue in equity, and the court must entertain the suit. It might or might not restrain the beneficiary from prosecuting the pending action at law. That was a matter for the discretion of that court, and not for us. These propositions are elementary, and, as shown in *John Hancock Mut. Life-Ins. Co.* v. *Dick,* are fortified by authorities. The briefs in this case furnish additional support to the claim of respondent.

"It is urged that the circuit court for the county of Bay first obtained jurisdiction, and that no other court could deprive it of such jurisdiction, or itself take jurisdiction of this controversy. What force there is in this contention applies to cases where two courts have concurrent jurisdiction. These courts have not concurrent jurisdiction, for the court of law has no power to cancel, as was shown in the case of *John Hancock Mut. Life-Ins. Co.* v. *Dick,* which is a case upon all fours with the present. * * *

"This attack upon a well-settled chancery jurisdiction has as a foundation the proposition that a person claiming under an insurance policy has a right to try the question of fraud before a jury, and therefore equity should in all cases permit the case to be tried by jury. But counsel does not stop there; he would have us go further, and hold that a chancellor has no discretion, but must yield his own jurisdiction in all such cases, and that, if he does not, we will compel it. There would be no more propriety in our curtailing equity jurisdiction than there would be in denying some legal jurisdiction. But suppose we were to do so, and hold that equity could not restrain the prosecution of an action of this sort; what should we do where the suit for cancellation is begun first? Will the next step be the contention that we should deny the jurisdiction of chancery in such a case, because we may think the right to make a legal defense is remedy enough? If so, and we yield to it, all concurrent jurisdiction would be taken from equity; and not only that, but the same would be true in all cases where, as in this case, equity has jurisdiction to give greater relief than a court of law can do. The right to equitable procedure and relief would not then depend upon established rules, but upon the ques-

tion whether the complainant ought to be satisfied with some lesser relief, which, in the opinion of an appellate court, would, or could be made to, answer his purpose. We understand that equitable rights are as sacred and as well guarded by the Constitution as the right of trial by jury, and we see neither the occasion nor the opportunity to increase the latter at the expense of the former."

These two decisions do not leave the question in doubt. They clearly sustain inviolate, the jurisdiction of equity, where the *equitable right to cancellation* exists, and refuse to permit it to be swept aside upon the insistence of interested parties, that their preference and not that of the complainants be allowed to prevail. These cases were, however, questioned again in the case of *Edwards* v. *Investment Co.*, 132 Mich. 1, where they were approved, Mr. Justice MOORE writing the opinion.

The case of *Northwestern Mut. Life-Ins. Co.* v. *Amos*, 136 Mich. 210, was a case of a bill filed to cancel a policy, upon the ground that it was fraudulently stamped, either by the instigation of the beneficiary, or the representative of the assured. A demurrer was sustained to the bill, three of five judges being of the opinion that the bill did not allege fraud. The majority opinion said, after citing the *Dick, Mactavish,* and *Edwards Cases,* that:

" Those cases have no application here. The basis of the equity jurisdiction there sustained was fraud—active fraud in the procurement of the policies, of the renewals thereof, after they had lapsed. The sole question in this case is one of fact, viz. : Were the policies delivered and the premiums paid, or their payment waived ? The doctrine in the *Dick Case* will not be extended to include cases of this character, where the questions involved are purely legal, no fraud is charged, and there is no possible reason for the interposition of a court of equity."

It is obvious that those cases were not overruled. A dissenting opinion was filed in this case, indicating a contrary view of the question, of whether the bill stated a charge of fraud, and collecting the authorities applicable

to the question of jurisdiction. The following language is pertinent here, especially as we do not understand that it was questioned in that case except as to the premises assumed:

"Under such allegations chancery has jurisdiction and it does not depend upon what the proofs may show. The bill states a case of fraud, and jurisdiction must depend upon that. This question arises upon demurrer, whereby the allegations of the bill are admitted. *Edwards* v. *Investment Co.*, 132 Mich. 1. It is possible that a hearing upon the merits may show these allegations to be unsupported by the evidence, as was the final result in *John Hancock Mut. Life-Ins. Co.* v. *Dick.*

"If there is jurisdiction in equity on the ground of cancellation, it is not limited to cases where a defense might not be made in a court of law. * * *

"The remedy is a concurrent one, and to hold that it depends upon the inadequacy of the legal remedy, is to abridge the equity jurisdiction, which our Constitution and laws guarantee, as unqualifiedly and effectively as they do legal remedies, and the right to trial by jury, as we held in *John Hancock Mut. Life-Ins. Co.* v. *Dick,* supra. The court should as carefully guard and protect this jurisdiction as any other."

The case of *Mack* v. *Village of Frankfort*, 123 Mich. 421, again discussed the *Dick Case*, and distinguished it. It was not a cancellation case, and while all concurred in sustaining the demurrer, but two of the members of the court assented to the opinion filed.

Another case written by Mr. Justice MOORE is *Edwards* v. *Investment Co.*, 132 Mich. 5. That was a case of a fraudulent contract. Undoubtedly an action at law would have been proper, and perhaps in a sense adequate, certainly as nearly adequate as in the present case. But the concurrent jurisdiction was sustained as follows:

"The second important ground for demurrer is that complainant has a complete and adequate remedy at law; counsel citing, among others, the two cases mentioned above. [*Rehberg* v. *Surety Co.*, 131 Mich. 135, and *Barney* v. *Surety Co.*, 131 Mich. 192.] It is not always true that, because a remedy might be pursued upon the law side of

the court, the chancery side may not also have jurisdiction. The bill alleges that complainant's money was obtained from her by means of fraud; that defendants conspired together, and were parties to the fraud; that a large business was done by the corporation; that it is insolvent; that defendants have converted the money taken in by the corporation, including the complainant's money, to their own use; that an accounting is necessary, and an examination of the books of the corporation. If the case stated in the bill is true—and it must, on demurrer, be deemed to be true—under the repeated decisions of this court the chancery side of the court has jurisdiction. *Wheeler* v. *Clinton Canal Bank*, Har. Ch. (Mich.) 449; *Wallace* v. *Harris*, 32 Mich. 380; *Wyckoff* v. *Machine Co.*, 43 Mich. 309; *Tompkins* v. *Hollister*, 60 Mich. 470; *Sherman* v. *Stove Co.*, 85 Mich. 169; *Cogswell* v. *Mitts*, 90 Mich. 353; *Warren* v. *Holbrook*, 95 Mich. 185; *John Hancock Mut. Life-Ins. Co.* v. *Dick*, 114 Mich. 337 (43 L. R. A. 566); *Blodgett* v. *Foster*, 114 Mich. 688; *Lieberman* v. *Sloman*, 118 Mich. 355; *Mactavish* v. *Kent Circuit Judge*, 122 Mich. 242; *Noble* v. *Grandin*, 125 Mich. 383."

It must be apparent that we are "threshing old straw" in a further discussion of this question. We will, however, refer to some of the earlier cases which vindicate the jurisdiction of equity, in those classes of cases clearly within the several branches of equity jurisdiction, where there is an equitable right involved, whether there may or may not also be a legal remedy, which we may think practically adequate. There are many such cases. Suit upon a note might be an adequate remedy, yet it is no reason for denying a foreclosure of a mortgage or suit to enforce a lien securing it. As in the *Edwards Case* an action for damages is many times adequate to enforce a right growing out of a fraud. And a suit for money had and received might answer every purpose, yet circumstances may justify an accounting or an injunction. In *Wheeler* v. *Clinton Canal Bank*, Har. Ch. (Mich.) 457, it was said, "Courts of chancery have also concurrent jurisdiction in cases of fraud." In *Wales* v. *Newbould*, 9 Mich. 45, a bill to restrain a pending suit at law, on a

promissory note, and for the surrender of the same and other personal property for fraud, was demurred to, upon the ground that complainant had an adequate remedy at law. The court held that notwithstanding the remedy at law was adequate, as respected the personal property, the bill for surrender would be sustained, and that as to the note, the remedy was not adequate, because complainant was entitled also to have the note surrendered, and not simply to defeat the action. In *Wright* v. *Hake*, 38 Mich. 525, a bill was filed to restrain an action at law on a replevin bond, on the ground of fraud. The court sustained the jurisdiction, Judge COOLEY saying:

" We have only to notice further the objection taken to the remedy in equity. It is urged in defense that the equities here insisted upon were available to the parties at law, and might have been relied upon in defense to the suit on the bond. This may be true, but it does not follow that equity could not take jurisdiction of the case. Equity has general jurisdiction in cases of fraud, and sureties have often been relieved under circumstances analogous to the present."

In *Wyckoff* v. *Machine Co.*, 43 Mich. 309:

" It is objected that complainant had ample remedy at law; and this is probably true. There has nevertheless always been a concurrent remedy in equity in cases of fraud; *Wheeler* v. *Clinton Canal Bank*, Har. Ch. (Mich.) 449; *Edsell* v. *Briggs*, 20 Mich. 433; and as equity in this case could require the surrender of the agreement and the machines on just terms, its remedies would be more complete and ample than any which a court of law could afford."

In *Tompkins* v. *Hollister*, 60 Mich. 479, MORSE, J., wrote:

" And it makes no difference that she may have an adequate remedy at law. Equity has concurrent jurisdiction in cases of fraud, and she can enforce her rights in this suit."

In *Brown* v. *Kalamazoo Circuit Judge*, 75 Mich. 274 (5 L. R. A. 226), a question of fact was decided by a

jury, by direction of the judge in a chancery cause, under a then recent statute. This court said:

"The cognizance of equitable questions belongs to the judiciary as a part of the judicial power, and under our Constitution must remain vested where it always has been vested heretofore."

*Sherman* v. *Stove Co.*, 85 Mich. 169, was a bill to cancel a subscription. The objection that there was an adequate remedy at law was overruled. In *Cogswell* v. *Mitts*, 90 Mich. 355, MONTGOMERY, J., said:

"It is contended, however, that jurisdiction in equity to cancel a writing does not exist if it appear that the complainant has a complete remedy at law, except in cases where fraud is shown. But we think the evidence in this case shows that there was an actual fraud."

That was a bill to cancel a promissory note. Obviously the fraud could have been shown as a defense at law. *Chicago, etc., R. Co.* v. *Miller*, 91 Mich. 166. In *Warren* v. *Holbrook*, 95 Mich. 185, GRANT, J., said:

"It is first contended that complainant's remedy at law is adequate and complete, and that, therefore, this bill cannot be maintained. Complainant might have maintained an action at law, and either attached or garnished the fund in the hands of Sweet. It requires no citation of authorities, however, to show that courts of equity have in many cases concurrent jurisdiction with courts of law. The general rule is that courts of equity have jurisdiction to compel an accounting where fiduciary relations exist, or fraud is charged. * * * In such case choice of remedies is with the party aggrieved, and he may proceed in equity for an accounting, and pursue the fund."

See, also, *Wallace* v. *Harris*, 32 Mich. 380, 389, where it is said:

"When the cause is only colorably one for partition, and the true end and purpose is evidently to obtain a determination of rights respecting title and possession which are purely legal, and no matters appear to create obstacles to a full, fair and final disposal of the controversy in a court of common law, there is solid ground for claiming

143 MICH.—11.

that the litigation ought to be carried on in such a tribunal. But the reason for remitting the investigation to a common law court is one of policy and fitness, rather than of any inherent want of power in a court of equity; and hence, if chancery decides, and there is no reversal in a proceeding directed to that end, the result is not void, but must stand and be respected."

It is not too much to say that these cases show that there is a concurrent remedy in cases of fraud, where there is an equitable right. It would not be much of a " concurrent remedy " which would be allowed only when there was no other. In view of these cases and the more recent ones of *John Hancock Mut. Life-Ins. Co.* v. *Dick, Mactavish* v. *Kent Circuit Judge,* and those in which they have been distinguished, and not in any way disapproved, the right of the complainant to this remedy should not be denied.

The cases relied on by counsel for the defendant are *Teft* v. *Stewart* which was cited and distinguished in the *Dick Case; Mack* v. *Village of Frankfort,* the opinion in which did not meet the approval of a majority of the court; and some Federal cases, which, as shown in the *Dick Case,* involve a Federal statute which has no bearing here. The decree of the learned circuit judge should be affirmed.

McALVAY and MONTGOMERY, JJ., concurred with HOOKER, J.