CULVER v. AVERY.

1. VENDOR AND PURCHASER—LAND CONTRACTS—FRAUD—RESCIS-
   SION.
   A purchaser of a house who has no experience in houses or
   carpentry, and so informs the agent of the vendor, is entitled
   to rely upon his representations that the house is of first-
   class workmanship, materials, and construction, and may re-
   scind a contract of purchase for substantial defects in such
   particulars.

2. EQUITY—JURISDICTION—FRAUD—EQUITABLE RELIEF.
   Courts of equity have concurrent jurisdiction with law courts
   to grant relief from the consequences of fraud, where one
   party has obtained an executory contract by fraud, and a
   cancellation is asked with an equitable lien for money paid
   and relief in the form of an accounting.

3. CONTRACTS—EQUITY—FRAUD—AFFIRMANCE OR RATIFICATION.
   A vendee of a house represented to be of good construction
   and workmanship does not affirm the contract by remaining
   in possession six months and making repeated demands of
   the vendor to remedy defects, and making payments, if he
   acted with reasonable promptness after discovering the ex-
   tent of the fraud and remains consistent with his notice of
   rescission.

4. EQUITY—RETENTION OF JURISDICTION.
   Equity having acquired jurisdiction of a cause will retain it to
   give such relief as will finally dispose of the controversy.

Appeal from Wayne; Mandell, J. Submitted April 7,
1910. (Docket No. 15.) Decided May 7, 1910.

Bill by Fred H. Culver and another against Waldo A.
Avery to set aside a land contract on the ground of fraud,
and for an accounting. From a decree dismissing the bill,
complainants appeal. Reversed, and decree entered for
complainants.

*Choate, Webster, Robertson & Lehmann* (*Ward N. Choate*, of counsel), for complainants.

*Rowland M. Connor*, for defendant.

STONE, J.   The bill of complaint was filed in this cause by the vendees to set aside a contract for the purchase of a house and lot, on the ground of fraud and misrepresentation, and to be relieved from the forfeiture clauses of said contract for the same reason, and to establish an equitable lien on the property for the amount paid by complainants, less the rental value of the premises, and for an accounting.

It appears that the defendant, through his agents, James and Edwin B. Nall, advertised in a newspaper of September 4, 1904, offering for sale certain houses on Moore place in the city of Detroit.   It set forth that the houses were all on brick foundations, honestly built, and that the best materials were used in the construction, and that the workmanship was excellent.   It is claimed that the complainant Fred H. Culver, attracted by this advertisement and the statements therein contained, called upon and talked with Edwin B. Nall, one of defendant's agents, upon the subject; that Mr. Nall represented to said complainant that the house in question was a first-class house, and that the workmanship was first-class; that the materials, lumber, and everything were first-class; that the woodwork was Georgia pine, with oil finish; that the house was well constructed and built of good materials. It is further claimed that complainant Fred H. Culver had had no experience with houses, had never built or bought a house before, and had no experience with carpentry or plastering, and that he so told Mr. Nall, and that he relied upon his representations; that, so relying upon the representations of the defendant in said advertisement, and those made by his said agent, the said complainant, on September 13, 1904, entered into a written land contract for the purchase of said house and lot from said defendant, which provided, among other things, for

the sale of said house and lot for $2,300, of which $300 was to be paid on delivery of the contract, and $20 on the 13th day of each month thereafter; said payments to include interest at the rate of 6 per cent. per annum.   Said contract contained the following provisions:

"7. And in case default shall be made by said second party, his heirs, executors, administrators or assigns, in any of the conditions above stipulated to be by him performed, it shall and may be lawful for said first party, if he shall see fit, to declare this contract void, such declaration to be made by brief notice thereof, addressed to said second party and delivered to him personally, or deposited in the post office at Detroit, Michigan, and said first party shall have the right to re-enter upon the said premises at any time after such default, and shall be at liberty to sell the same to any person or persons whomsoever, without being liable in law or equity to said second party or any person claiming under him for any damages in consequence of such sale, or to return any payments made on account of this contract, and any payments that shall have been made be held by said first party as stipulated damages for the nonperformance of this contract.   And said first party shall have a right to recover all damages sustained by reason of the holding over of said second party without permission; and, in case this contract shall be so declared void, the party of the second part shall thenceforth be deemed a mere tenant at will under said first party and shall be liable to be proceeded against under the provisions of the statutes regulating summary proceedings to recover possession of land, being chapter 308 of the Compiled Laws of Michigan, 1897, and the acts amending the same, without notice to quit, notice to quit being hereby expressly waived by said second party.

"8. It is hereby expressly understood and declared that time is and shall be deemed and taken as of the very essence of this contract; and that unless the same shall in all respects be complied with by said second party at the respective times and in the manner above limited and specified, that said second party shall lose and be debarred from all rights, remedies or actions, either in law or equity, upon or under this contract."

Complainants made payments as follows: September 13, 1904, $300, October 13, 1904, $25, December 9, 1904, $25,

December 19, 1904, $25, and January 23, 1905, $25, on account of both principal and interest. The house was not complete at the time of the purchase, and defendant's said agent agreed to complete it in every particular. Complainants moved into the house September 19, 1904. Complainant Fred H. Culver testified upon the hearing that he made repeated efforts to have defendant complete the house as promised. This not having been done, Mr. Culver wrote a personal letter to the defendant on January 17, 1905, and received the following:

                                "January 20, 1905.
" Mr. FRED H. CULVER,
                "Detroit, Mich.
" *Dear Sir:* Upon receipt of your communication of the 17th, I called on Mr. Nall and found much to my surprise that he had done nothing toward the replacing of the door in your house, which he was instructed to do some time ago. I ordered him to place the order for same at once and he advised me yesterday that Frolich & Co. would have the door completed today, and that it would be placed in your house within a day or two. In regard to the other work of which you spoke when here, I understand that the plasterer had been out and fixed the places which needed his attention. Mr. Nall said he would call at your place and report to me later today regarding everything, so I do not consider it necessary for me to make a personal visit, as I am very busy and cannot spare the time at present. In the meantime, however, I shall expect your prompt attention to the payment due on the 13th, in accordance with the terms of your contract.
                "Yours respectfully,
                        "WALDO A. AVERY."

Said complainant claims that, relying upon the repeated promises of the defendant, he made the payments as above stated. Said complainant testified that soon after making the last payment he made an examination of the house with a builder, and that they found the following conditions: That some of the doors would not open and shut properly, and that the windows would not shove up and down, and seemed to be on a slant, and one slanted one way and one the other; that the front door was too

small for the casing. "You could see out down into the street. We had to keep a quilt nailed over the door, and came and went out the back door." The newel post on the stairway was raised a half inch from the floor. "We had to put a moulding around the baseboard downstairs and upstairs." The window at the front landing on the stairs was in a bad shape. The window cap and the casing had pulled away from the plaster. It was loose, and did not have enough nails to hold it. The window did not fit tight enough to keep the weather out. The running board along the bottom of the plastering up the stairs was in three pieces, was not properly nailed, and was pulling away from the plastering. Its joints did not fit. The plastering was cracked on the edge, and was not properly finished. In the front room uptairs the plaster did not come down to the top of the door. The door was not hinged properly; one hinge was set in and the other out on the edge, and it could not close. There were four or five doors that way. You could put your fingers under the mopboard. The windows left an opening in the window sills. The supports to the stoop were 24x4 stuck on a piece of paving block, and they settled and the porch drew away from the house in front and left a hole, and one could look in and see the plaster in the room back. In the bath room the baseboard pulled away, and one could see in between the partition. The water pipe ran down next the outside of the house, with nothing to protect it, and it froze. The house had settled downstairs, and the floor ran towards the center. The house was not firm, but would shake when one walked through it, and the floor was slowly settling. A big patch of plastering fell down in the kitchen on February 3d. There was a three-foot crack in the corner of the kitchen. The surface of the plaster over the whole house was cracked. There was a big crack in the chimney, and it was settling, and there was danger of fire. There was a 12x12 beam running

north and south supporting the house. It rested on a middle pier under its center, and was about an inch and a half on the cellar wall at one end. The other end only came up to the pier. There was another 12x12 piece on the pier, and to the beam two half-inch boards were nailed on the sides, holding the beam to the block on the pier. The beam did not reach the pier, and had sunk about an inch. These are only a part of the defects claimed and testified to by said complainant.

On February 24, 1905, complainant Fred H. Culver demanded in writing the return of the money which he had paid upon said contract, and tendered to the defendant a quitclaim deed of the premises, signed by himself and wife. His letter of that date to the defendant will show the complaint made by him. It was as follows:

"DETROIT, Feb. 24, 1905.

"To WALDO A. AVERY:

"I hereby make demand for the repayment to me of the sum of four hundred dollars ($400.00) heretofore paid by me to you under a certain land contract hereinafter described, which contract I hereby repudiate for the reasons hereinafter given, less the reasonable rental value of said premises during my occupancy, and hereby tender to you said contract, a quitclaim signed by myself and wife covering the premises described in said contract, and offer to release all claims which I may have in said contract and land and surrender said premises to you and vacate the same. Said contract is dated Sept. 13, 1904, is by and between Waldo A. Avery and Fred H. Culver, and covers all that certain piece or parcel of land, situate in the city of Detroit, county of Wayne, State of Michigan, known and described as lot forty-four (44) Moore Place, being a part of Hamlin & Fordyce's Grand River avenue subdivision.

"The reasons for repudiating said contract and making this demand and tender are as follows: Because said contract was entered into by me through fraud, misrepresentations and undue advantage on the part of yourself or agents, and because the house on said premises was represented by yourself or agents to be a first-class dwelling house in every respect, well built and built of good mate-

rials, in first-class condition, dry, warm and tight, with a good foundation, with water, gas and sewer connections and plumbing well and properly put in, and in every way suitable for a dwelling house, when in fact it is not a first-class dwelling house, it is not built well, is not built of good or even proper material, is not in first-class condition, is wet, cold, and not tight, had not a good foundation, is now, when the ground is frozen, settling, has not water, gas and sewer connections and plumbing properly put in, and is not suitable for a dwelling house in its present condition.  Among other particulars, part of the house is sinking, the floors have become uneven, the windows and doors shrunken, the plaster is cracking and appears ready to fall, part having already fallen, the baseboards are separating from both the plaster and the floor, the woodwork is shrinking, in fact you can see outdoors through the cracks which continually admit the wind, rain and snow, and are never certain as to when any part of the house may come down.   These are but a few of the many defects which I hereby offer to specifically point out at any reasonable time you desire to inspect said premises.   The condition of the premises has caused sickness and ill health to myself and family since our occupancy, and there is danger of the plaster falling at the present time, part having already fallen, and I shall look to you for all damages arising from any of said causes.   This demand, tender and notice are given for the purpose of protecting my rights in the premises.

                                                  "FRED H. CULVER."

On March 7, 1905, the defendant served a written notice of forfeiture and demand of possession upon said Fred H. Culver, on the ground of nonpayment of the sums specified in the contract, and on March 18, 1905, the defendant commenced proceedings of ouster before the circuit court commissioner.   Before that case was heard, and on March 23, 1905, the original bill of complaint in this cause was filed, and a temporary injunction restraining the prosecution of the suit before said commissioner was obtained and served.   The bill was demurred to, and on April 5, 1905, the demurrer was sustained and the injunction was dissolved.   On the same day a new summary proceeding was begun by the defendant, and on April 10th a judg-

ment of ouster was entered, holding that said Fred H. Culver unlawfully held possession of said premises, and on April 15, 1905, complainants surrendered possession of the premises. Subsequently the bill of complaint in this cause was amended, the defendant, after the overruling of a demurrer, answered, and the case was put at issue and was heard upon the pleadings and evidence. As late as April 8th, Mr. Culver had a conference with defendant, at which the former renewed his complaints, and there was some talk of a settlement, but none was reached.

Upon the hearing Edwin B. Nall was sworn on behalf of the defendant. Among other things, he testified that complainant Culver came to him to buy a house; that witness told him they had a good, if not the best, proposition in that part of the city for a moderate priced house, at a moderate cost, on easy terms; that witness told Culver that the houses were well constructed, built of good material, and good houses for the price; that Culver and his wife examined the houses, and selected the one in question; that they had free access to the house, and every opportunity to examine it, and expressed themselves as satisfied with it; that complaint was made of the door and windows, and that they were fixed, but witness did not remember whether they were fixed immediately or not; that the plaster job in the kitchen was a poor one; that after complainants moved out, defendant put in new ceiling in the kitchen, and did some little repair in the house that did not amount to much; that the cellar was not changed. As to the settling of the house, one pier at the rear in the center of the house was defective. It was afterwards fixed. There was a little settling on account of the piers. On cross-examination Mr. Nall testified that after complainants went out, and before selling to another party, a new pier was built.

"*Q.* If that main joist, that main timber, if it came up just to the edge of the pier and it took a block just enough

to carry it over the pier about an inch, boards on each side, you would not say it was well constructed ?

"*A.* If it did not rest directly on the pier I would not consider it so.

"*Q.* It would be a serious defect ?

"*A.* Yes; it would be a defect.

"*Q.* Is that so ?

"*A.* Yes, sir.

"*Q.* It would cause the house to settle if the nails gave way ?

"*A.* It would depend upon how well it was spliced on the side.

"*Q.* If as a matter of fact the joists did come down an inch, the house would naturally settle ?

"*A.* The house naturally would settle."

The defendant's evidence tended to show that the complainant Culver examined the house and entered into the contract upon his own judgment. The complainants' claim was that Culver relied upon the representations made by defendant's agent, and was deceived thereby. After the hearing of the cause the bill of complaint was dismissed, with costs, and the complainants have appealed.

It is stated by counsel that the circuit judge dismissed the bill on the ground that complainants had an adequate remedy at law. No written opinion or reasons appear in the record. A careful reading of the evidence and record satisfies us that the equities of the case are with the complainants, and that they were entitled to the relief prayed for. It seems very clear that the representations made by defendant's agent were of a substantial and material nature as to material, construction and workmanship of the house. And we find from the evidence that Mr. Culver had the right to, and did, rely upon the representations, and was deceived and injured thereby. Many of the defects developed after the complainants moved into the house, notably the settling of the structure, the sagging of the floors, the falling away of the porch, the defects in the cellar, and the freezing of the water pipes. Upon complaint some slight repairs were made by defendant, but it is not claimed that many of the most serious defects

were remedied at all during the occupancy of complainants.

That courts of equity have concurrent jurisdiction with the law courts to grant relief from the consequences of fraud and misrepresentation is a proposition too firmly established in the jurisprudence of this State to be now questioned. Especially is this true where one party has obtained an executory contract by fraud, and the injured party asks for a cancellation of it, for an equitable lien upon property for money paid on such a contract, and for an accounting.

It is urged by defendant's counsel that complainants affirmed the contract by continuous possession for over six months, by repeated demands for the remedying of defects, and the making of changes, and by making certain of the payments under the contract after many of the defects were known to them, and *Mestler* v. *Jeffries*, 145 Mich. 598 (108 N. W. 994), is cited in support of the position. The cases are easily distinguished. The extent of the fraud practiced upon complainants was not discovered until long after they went into possession. The time they remained in possession after that, before the offer to rescind and deed back, was not an unreasonable one. The last payment was made in January. The true doctrine is that a party intending to rescind a contract because of fraud must be prompt in communicating the fraud when discovered; and consistent in his notice to the opposite party of the use he intends to make of it. The letter of Fred H. Culver to defendant, of date February 24, 1905, meets these requirements.

Upon the question of the right to file a bill in equity, in a case like this, we might cite more than a score of cases. We shall only cite the case of *Fred Macey Co.* v. *Macey*, 143 Mich. 138 (106 N. W. 722, 5 L. R. A. [N. S.] 1036). The whole subject is there discussed, and most of the Michigan decisions are reviewed. As Justice HOOKER said in that case, it would be "threshing old straw" to discuss the cases. It is proper to say, however, that the

case of *Mack* v. *Village of Frankfort*, 123 Mich. 421 (82 N. W. 209), and kindred cases are easily distinguished from this case. In the case last cited the bill called for a money judgment, and did not show that the equity powers of the court were at all necessary for its enforcement. Here, upon the ground of fraud, the complainants ask to be relieved from the forfeiture clause of the contract, for an equitable lien upon the premises for the money paid upon the contract, and for insurance and taxes, and for an accounting to determine the amount due them, over and above a fair rental of the property while used by them. The principle that equity, having once acquired jurisdiction, will retain it, to give such full relief as will finally dispose of the controversy, is well settled in this State. See cases cited in *Hall* v. *Nester*, 122 Mich. 146 (80 N. W. 982).

The decree below is reversed, and one will be entered for complainants in accordance with the prayer of the amended bill, with costs of both courts to complainants.

The decree will remand the cause for an accounting upon the basis here indicated.

MOORE, MCALVAY, BROOKE, and BLAIR, JJ., concurred.