**Walter P. NIECKO and Thelma A. Niecko, Plaintiffs,**

v.

**EMRO MARKETING COMPANY, Defendant.**

**Civ. A. No. 90–CV–71519–DT.**

United States District Court, E.D. Michigan, S.D.

July 2, 1991.

Bruce T. Wallace, Ann Arbor, Mich., for plaintiffs.

Mark F. Miller, Detroit, Mich., for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

Presently before the Court is the Defendant's Motion for Summary Judgment. This motion was brought before the Court for hearing on May 14, 1991, at which time the Court heard the arguments of counsel for both parties. At the May 14, 1991 hearing, the Court specifically requested the parties to file supplemental briefs addressing certain additional issues raised by the Court at the hearing. The parties have now filed their supplemental briefs, which the Court has reviewed and considered in rendering this opinion.

FACTS:

The Plaintiffs, Walter Niecko and Thelma Niecko, husband and wife, seek to recover the $138,367 that they spent to clean up certain toxic hydrocarbons, specifically benzene, toluene, ethyl benzene, and xylene, from the soil of a certain parcel of real property located near the I–94 interstate expressway in Jackson Michigan. The Plaintiffs purchased the property from Defendant Emro Marketing Company ("Emro") in March, 1987 for $46,000. Emro is a subsidiary of Marathon Oil Company.

In the mid–1960s, the property was owned by Humble Oil & Refining Company which built and operated a gas station on the property at that time. Humble eventually became a part of Exxon and Exxon operated the gas station until June, 1977. At that time, the gas station and the real property were purchased from Exxon by Checker Oil Company. In 1981, Checker permanently closed the gas station but retained ownership of the property. Checker was itself subsequently purchased by Marathon Oil Company. Marathon transferred title to the real property to Defendant Emro, its subsidiary, on January 1, 1984. The gas station was never operated by Emro or during Emro's ownership of the property, but Emro did assume the liabilities of Checker Oil Company, when that company was purchased by Marathon.

When Emro sold the property to the Plaintiffs in March, 1987, the purchase contract contained the following disclaimers:

10. It is expressly agreed that Seller makes no warranties that the subject property complies with federal, state or local governmental laws or regulations applicable to the property or its use. *Buyer has fully examined and inspected the property* and takes the property in its existing condition with no warranties of any kind concerning the condition of the property or its use.

11. *Buyer acknowledges that he has inspected and is familiar with the condition of the property;* that Seller has not made and makes no warranties or representations as to the condition of said property, including, but not limited to, *soil conditions,* zoning, building code violations, building line, building construction, use and occupancy restrictions (and violations of any of the foregoing), availability of utilities; and that Buyer is purchasing the same "as is"; *that he assumes all responsibility for any damages caused by the conditions on the property upon transfer of title.*

(Exhibit A to Defendant's Summary Judgment Brief, Pars. 10–11, pp. 2–3) (emphasis added).

The sale of the property from Emro to the Plaintiffs occurred in March, 1987, and the Plaintiffs took possession of the proper-

ty in 1987. In 1989, McDonald's Corporation approached the Plaintiffs regarding the possible sale of the property to McDonald's for one of its restaurants. (The property was conveniently situated adjacent to I–94.) Before completing its purchase from the Plaintiffs, McDonald's conducted an environmental audit of the property, which uncovered the existence of hydrocarbons in the soil. McDonald's told the Plaintiffs about the soil contamination and conditioned its purchase of the property on the Plaintiff's removal of the contaminated soil. After the soil was removed, McDonald's purchased the property from the Plaintiffs for $110,000.

According to the Affidavit of Plaintiff Walter Niecko, Emro never disclosed to him that there were previously underground storage tanks on the property which contained gasoline and waste oil. Emro further failed to disclose that the storage tanks sat unused with gasoline and oil in them from 1981, the time the gas station was closed, until 1984, when the underground storage tanks were removed.[1] Emro also never disclosed to him that the underground pipes which connected the underground storage tanks to the individual gas pumps remained in the ground even at the time of the sale. According to Walter Niecko, when the soil was removed at McDonald's request, the underground pipes were also dug up and were then in a state of severe corrosion.[2]

Walter Niecko's affidavit omits any claim that he was unaware that the property was previously operated as a gas station or that he was unaware that there were previously underground storage tanks on the property. Nevertheless, in their complaint, the Plaintiffs assert that "Plaintiffs would not have purchased said property from Defendant if Defendant had disclosed to them that there were leaking underground storage tanks on the property." (Complaint, Par. 21, p. 4).

In its summary judgment brief, Emro notes that the Plaintiffs admitted, in response to Emro's interrogatories, that they conducted a "surface inspection" of the property. Further, Plaintiffs admitted, in response to Emro's requests for admissions, that they were previously aware that a gas station was operated on the property.

In July, 1990, the Plaintiffs filed this action to recover the $138,367 they allegedly spent to remove and dispose of the contaminated soil. The First Amended Complaint is divided into eight distinct theories of liability. In Count I, the Plaintiffs argue that the Emro breached the purchase contract. Because the property turned out to be worth less than zero (i.e., it cost more to clean it up than it was worth even in clean condition), there was a "failure of consideration."

In Count II of the First Amended Complaint, the Plaintiffs argue that Emro committed fraud when it failed to disclose to them, prior to the purchase, that the property contained underground storage tanks and that the tanks had leaked hazardous substances into the soil.

In Count III, the Plaintiffs seek to recover the $138,367 they spent to clean up the property pursuant to the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607(a). In Count IV, the Plaintiffs seek to recover the same clean-up costs under a "contribution" theory.

In Count V, the Plaintiffs argue that the Michigan Environmental Protection Act, M.C.L. § 691.1201, et seq., entitles them to unspecified "declaratory and equitable relief" from Emro on account of the latter's pollution of the property. Counts VI, VII, and VIII are common-law negligence, nuisance, and trespass claims, respectively.

In their response to the Defendant's Motion for Summary Judgment the Plaintiffs claim that they not only seek to recover the $138,367 they expended to haul away the

---

1. Willis Deetz, the former operator of the gas station, testified in his deposition that the underground storage tanks were pumped dry when the station was closed in 1981.

2. The affidavit of the Plaintiffs' expert, Keith Gadway, indicates that the soil contamination resulted from leakage from the underground tanks and the gas pumps, not the connecting pipes.

contaminated soil on the property sold to them by Emro; they also seek to recover the alleged loss of the market value to the site and to the adjacent, vacant, 5½ acre parcel which the Plaintiffs also own. However, the Plaintiffs purchased the adjacent 5½ acre parcel in December, 1986 for $20,-000, and sold it to McDonald's, in 1989, for $250,000. According to the affidavit of Plaintiff Walter Niecko, McDonald's now intends to sell the 5½ acre parcel for $660,-000.

Thus, even taking into consideration the $138,367 the Plaintiffs paid to clean up the property purchased from Emro, and the price they paid for that parcel ($46,000) and the adjacent 5½ acre parcel ($20,000), the Plaintiffs ultimately gained $155,633 from their ownership of the two parcels.

## DISCUSSION:

### A. BREACH OF CONTRACT

Emro argues that the Plaintiffs' breach of contract claim should be dismissed because the Plaintiffs received just what they bargained for. The disclaimers in Paragraphs 10–11 make clear that the Plaintiffs voluntarily assumed the risks associated with the condition of the property, including, specifically, "soil conditions." Emro further argues that these disclaimers are fully enforceable under Michigan law, citing *Lenawee County Board of Health v. Messerly*, 417 Mich. 17, 331 N.W.2d 203 (1982); *Christy v. Glass*, 415 Mich. 684, 329 N.W.2d 748 (1982); *Dingeman v. Reffitt*, 152 Mich.App. 350, 393 N.W.2d 632 (1986); *Allied Corporation v. Frola*, 730 F.Supp. 626 (D.N.J.1990).

In response, the Plaintiffs argue that "because Defendant is strictly liable, the 'as is' clause in the contract should not be a defense to Plaintiff's action to recover cleanup costs. Therefore, Defendant's Motion for Summary Judgment as to Plaintiff's Breach of Contract Count must be denied." However, in making this argument, the Plaintiffs blur the distinction between their breach of contract cause of action (Count I of the complaint) and their statutory and common-law tort actions set forth in other counts of the First Amended Complaint. As stated by the court in *Frola:*

Count 1 alleges that Allied breached the covenant against grantor's acts in the deed to Frola because the site was "charged and encumbered by asphalt, tars and oils containing hazardous substances and oils." Amended Counterclaim, count 1, para. 10. The deed, however, expressly states that it is "[s]ubject to covenants, easements, agreements and restrictions of record." The contract upon which the deed is based provides, in a typed addition to the printed form: "Premises are sold 'as is.'" Allied argues that the "as is" clause precludes any cause of action in contract based on implied representations as to the condition of the property. The Court agrees.

The "as is" clause does not, however, extinguish Frola and Von Dohln's tort theories.

*Frola,* 730 F.Supp. pp. 629–30.

Second, the Plaintiffs argue that, although *Messerly* held that the buyer generally bears the risk of loss under an "as is" contract, the *Christy* court set forth two exceptions to this general rule, both of which, according to the Plaintiffs, apply in this case. The court in *Christy* stated:

Under the common law, a land vendor who surrenders title, possession, and control of property shifts all responsibility for the land's condition to the purchaser. Caveat emptor prevails in land sales, and the vendor, with two exceptions, is not liable for any harm due to defects existing at the time of sale.

The first exception is the vendor's duty to disclose to the purchaser any concealed condition *known to him which involves an unreasonable danger.* Failure to make such a disclosure or efforts to actively conceal [sic] a dangerous condition render the vendor liable for resulting injuries. The second exception is that a vendor is liable to those outside the land for a dangerous condition on the land after the sale until the purchaser discovers or should have discovered it. *Once the purchaser discovers the defect and has had a reasonable opportunity*

*to take precautions, third parties such as subvendees have no further recourse against the vendor.*

*Christy*, 329 N.W.2d, at 752 (emphasis added).

The Court finds the Plaintiffs' reliance on *Christy* to be misplaced for two reasons. First, although both sides in this case rely on this discussion in *Christy* to support their respective positions, the facts in *Christy* are distinguishable. In *Christy* there was no contractual relationship between the defendant land developer (to whom the above-quoted discussion was addressed) and the plaintiff homeowners. Ultimately, the court found that, since the *intervening* purchaser of the property from the defendant developer was told of the defect in the property's water system, the developer could no longer be liable to subsequent purchasers. *Id.*, 329 N.W.2d at 753. Furthermore, since there was no contractual relationship between the parties, the *Christy* court had no occasion to decide whether the provision of an "as is" clause in the purchase contract would have relieved the seller from liability.

Secondly, the facts in the instant case show that there was no "concealed condition known to [Emro] which involves an unreasonable danger." In response to the Plaintiffs' interrogatories, Emro stated, "The Defendant has no information indicating any contamination on the subject property prior to or during this Defendant's ownership of said property ..." (Exhibit C to Defendant's Summary Judgment Brief, p. 10), and "The Defendant conducted a 'sniff' test at the time the tanks were removed in December of 1984. At that time, there was no indication of any contamination." *Id.*, at p. 9.

Further, Emro challenges Plaintiffs to come forward with evidence not only that Emro knew the condition of the property constituted an "unreasonable danger," but to show that the degree of contamination present in the soil did, in fact, present an "unreasonable danger." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (where the nonmoving party will bear the burden of proof at trial on a dispositive issue, summary judgment can be granted on the basis of pleadings, depositions, answers to interrogatories, and admissions on file). The Plaintiffs ask the Court to *presume* that "[c]ontamination of a potential water supply with hydrocarbons could certainly be described as an unreasonably dangerous condition." However, the degree of the danger present depends on many factors, including the concentration of the contaminants in the soil and ground water and whether the contamination constitutes a danger considering the likely use of the property and the availability of alternative water supplies.

In the instant case, the only evidence that the condition of the property was dangerous offered by the Plaintiffs is the fact that McDonald's was unwilling to purchase the property for use as one of its restaurants unless the Plaintiffs removed the contaminated soil. McDonald's decision could have been overly cautious, or perhaps McDonald's perceived that the Plaintiffs would be willing to clean up the property in order to facilitate the sale, whether or not the degree of contamination actually presented any present or future danger. Thus, the Court cannot infer from McDonald's conduct that the property, as sold by Emro to the Plaintiffs, presented an "unreasonable danger."

In the absence of evidence that there was an unreasonable danger and that Emro knew about it at the time it sold the property to the Plaintiffs, the Court concludes that the "as is" disclaimer in the purchase contract protects Emro from contractual liability to the Plaintiffs. In *Messerly*, the Michigan Supreme Court held that a similar "as is" disclaimer in the purchase agreement was legally effective to insulate the sellers from liability to the purchasers on account of a defective sewerage system which rendered the property (a 3-unit apartment complex purchased for rental income) uninhabitable. The *Messerly* court stated:

While there is no express assumption in the contract by either party of the risk of the property becoming uninhabitable,

there was indeed some agreed allocation of the risk to the vendees by the incorporation of an "as is" clause into the contract which, we repeat, provided:

> "Purchaser has examined this property and agrees to accept same in its present condition. There are no other or additional written or oral understandings."

That is a persuasive indication that the parties considered that, as between them, such risk as related to the "present condition" of the property should lie with the purchaser. If the "as is" clause is to have any meaning at all, it must be interpreted to refer to those defects which were unknown at the time that the contract was executed. Thus, the parties themselves assigned the risk of loss to Mr. and Mrs. Pickles.

> We conclude that Mr. and Mrs. Pickles are not entitled to the equitable remedy of rescission and, accordingly, reverse the decision [of] the Court of Appeals.

*Messerly*, 331 N.W.2d, at 210–211.

The "as is" provision in the purchase contract at issue in this case is no less applicable than the one in the *Messerly* purchase contract. In the instant case, not only does the purchase contract recite that the Plaintiffs have inspected the property, it also specifically disclaims any warranties or representations "as to the condition of said property, including, but not limited to, *soil conditions....*" Under these circumstances, the Court finds that the risk of unknown soil contamination has been contractually assumed by the Plaintiffs, and Emro, therefore, cannot be held liable on a breach of contract theory.

## B. FRAUD

■ Plaintiffs argue that their claim for "fraudulent concealment" may be maintained even though Emro did not make any affirmative misrepresentations to them. In their view, Emro's failure to disclose that underground storage tanks were once located on the property, but were removed in 1984, and that the connecting pipes remained underground at the time of the sale constitutes actionable fraud under Michigan law because, "one who remains silent when fair dealing requires him to speak may be guilty of fraudulent concealment." (quoting *Nowicki v. Podgorski*, 359 Mich. 18, 101 N.W.2d 371, 378 (1960)). The Plaintiffs further rely on *Hand v. Dayton–Hudson*, 775 F.2d 757 (6th Cir.1985), and *Fred Macey Company v. Macey*, 143 Mich. 138, 153, 106 N.W. 722 (1906), for the proposition that silence can, under the right circumstances, equal fraud.

The cited cases are not dispositive here, however, since the circumstances in the instant case are not such that Emro had any duty to speak up. The thread running through the cited cases is that silence may constitute fraud where the surrounding circumstances are known and intended by the defendant to mislead the plaintiff and will mislead the plaintiff in the absence of further disclosure on the defendant's part.

Thus, in *Hand*, a discharged employee had been given a proposed, written settlement agreement prepared by Dayton–Hudson for the employee's review and signature. The employee retyped the agreement with the specific intent to make the copy appear to be identical to the one prepared by Dayton–Hudson, although he actually altered one of its material terms, by including a new provision excepting his claims for age discrimination from the general release provisions drafted by Dayton–Hudson. The employee then signed the duplicate agreement and returned it to Dayton–Hudson in the hope that the latter would not notice the change. In fact, Dayton–Hudson was successfully misled and signed the agreement. When the employee later filed a suit for age discrimination, the court held him to the terms of the original agreement, noting that the plaintiff's conduct in secretly altering the written contract without disclosing the alteration to Dayton–Hudson amounted to fraud. *Hand*, 775 F.2d, at 759 ("Hand committed fraud by not informing Dayton–Hudson of the changes he made in the release.").

Similarly, in *Nowicki*, the proprietors of a grocery business, husband and wife, agreed to sell the business to plaintiff Nowicki. The husband made affirmative

oral misrepresentations to the purchaser regarding the volume of sales generated by the business in the past. The wife remained silent, although she was physically present when her husband made the misrepresentations, knew them to be false, and, yet, said nothing. As a result, the Michigan Supreme Court held that she could be held liable for he husband's fraud. *Nowicki*, 101 N.W.2d, at 378.

Finally, in *Macey*, the organizers and promoters of a newly-formed Michigan corporation sold all the newly issued stock in the corporation based upon a prospectus stating that the corporation would be the owner of various patents, copyrights, and trademarks. At the same time, one of the individual promoters had already entered into a secret agreement with the corporation whereby the corporation would pay him substantial royalties on account of the same patents, etc., that were to be "owned" by the corporation, according to the prospectus. The Michigan Supreme Court noted first that this secret agreement violated the fiduciary duty the corporation's promoters owed to the corporation and stockholders. *Macey*, 143 Mich., at 152. Further, the Court noted that, under the circumstances of that case, the promoter had a duty to disclose the secret agreement to the prospective stock purchasers, and his failure to disclose amounted to fraud. *Id.*, at 153. Like the other cases upon which Plaintiffs rely, the information contained in the prospectus in *Macey* was highly misleading without the disclosure of the secret royalty agreement.

In the instant case, the surrounding circumstances are not such that Emro could be said to have intended that the Plaintiffs receive a mistaken impression regarding the soil condition of the property. Instead, the purchase agreement itself was drafted specifically to *disclaim* any representations and warranties concerning the condition of the property, in general, and the soil condition, in particular. Emro did not have any actual knowledge that the soil was contaminated. Although Emro was aware that the property had previously been operated as a gas station, so did the Plaintiffs. In fact, the Plaintiffs owned the adjacent parcel. Although Emro did not inform the Plaintiffs that the underground storage tanks had been removed and the connecting pipes remained underground, neither did Emro deny these facts. Instead, the parties mutually agreed and represented to each other that the Plaintiffs would conduct their own investigation of the property. If the Plaintiffs had diligently performed this duty of inspection under the contract, it is likely that they would have discovered the true extent of the soil contamination. Indeed, McDonald's conducted an environmental audit before it agreed to purchase the property from the Plaintiffs, and McDonald's discovered the contamination.

Instead of requiring Emro to make a thorough analysis and disclosure of the condition of the property at the time of the sale, including the existence or prior removal of hidden underground storage tanks and pipes, the parties here contracted with each other to transfer this duty to the Plaintiffs. If the Plaintiffs had wanted representations and warranties from Emro concerning the condition of the property, they could have asked for them, possibly offering to Emro, in exchange, an increase in the purchase price. Having once struck what now appears to be an imprudent bargain, the Plaintiffs ask the Court to interfere with their own contracting powers for no other reason than that they made a bad deal when left to their own devices in the first instance.

The Court concludes that there is nothing in the surrounding circumstances from which the Court could infer that Emro had a duty, under Michigan law, to make further disclosures to the Plaintiffs. The Court will, therefore, dismiss the Plaintiffs' "fraudulent concealment" claim.

## C. THE PLAINTIFFS' CERCLA CLAIM

■ Emro argues that the Plaintiffs' CERCLA claim is defective because the substances that are alleged to have contaminated the soil in this case—benzene, toluene, ethyl benzene, and xylene—are specifically excluded from CERCLA cover-

age by the "petroleum exclusion" set forth in 42 U.S.C. § 9601(14).

As a general matter, CERCLA allows persons (such as the Plaintiffs) to recover the costs expended by them to clean up "hazardous substances." Section 107(a) of CERCLA reads, in pertinent part, as follows:

**§ 9607. Liability**

**(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date**

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

\* \* \* \* \* \*

(2) any person who at the time of disposal of any *hazardous substance* owned or operated any facility at which such *hazardous substances* were disposed of . . .

\* \* \* \* \* \*

. . . shall be liable for—

\* \* \* \* \* \*

(B) any other necessary costs of response incurred by any other person [other than the United States] consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release . . .

42 U.S.C. § 9607(a)(1)(B), (C) (Supp.1991).

The term, "hazardous substance" is defined in CERCLA Section 101(14):

**§ 9601. Definitions**

For purpose of this subchapter—

\* \* \* \* \* \*

(14) The term, "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title; and (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] (but not including

any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C. § 6901 *et seq.*] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clear Air Act [42 U.S.C. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. *The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph,* and the term does not include natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14) (emphasis added).

The emphasized portion of this statute creates the "petroleum exclusion" which Emro claims excepts from the definition of "hazardous substance," and thus excepts from the coverage of 42 U.S.C. § 9607(a), the benzene, toluene, ethyl benzene, and xylene which the Plaintiffs spent $138,000 to remove from the property.

This "petroleum exclusion" has been universally interpreted by both the Environmental Protection Agency and the courts to remove from the coverage of CERCLA those otherwise hazardous substances which are *inherent* in petroleum, but not hazardous substances that are added to, or mixed with, a petroleum product during or after use. *Wilshire Westwood Assoc. v. Atlantic Richfield Corp.,* 881 F.2d 801, 805 (9th Cir.1989); *United States v. Western Processing Co., Inc.,* 761 F.Supp. 713 (W.D.Wash.1991) (waste oil resulting from rinsing and cleaning oil tanks is not within petroleum exclusion because it contains nickel and chromium oxides that are scraped from the tanks' interior and added to the waste oil during the cleaning process); *United States v. Alcan Aluminum Corp.,* 755 F.Supp. 531, 539 (N.D.N.Y.1991) (petroleum exclusion does not cover con-

taminants added to oil through use); *New York v. Exxon Corp.,* 744 F.Supp. 474, 489–490 (S.D.N.Y.1990) (petroleum exclusion does not encompass waste oil in which the concentration of hazardous substances is increased through use). *Washington v. Time Oil Co.,* 687 F.Supp. 529, 531–532 (W.D.Wash.1988) (hazardous substances found in excess of concentrations occurring naturally in petroleum during refining process and others not normally found in refining are not within petroleum exclusion); *Philadelphia v. Stepan Chemical Co.,* 1988 WL 136530, 1988 U.S.Dist.LEXIS 14219 (E.D.Pa.1988).

The Plaintiffs' own expert witness states in his affidavit that the benzene, toluene, ethyl toluene, and xylene contaminated the soil as a result of refined gasoline leaking into the ground both from the underground storage tanks and in the area of the gas pumps. (Affidavit of Keith Gadway, Exhibit E to Plaintiffs' Brief, Par. 3, p. 2). Although these compounds are otherwise "hazardous substances," each of them is an *inherent,* indigenous component of gasoline. *Wilshire Westwood,* 881 F.2d, at 803. Therefore, these components come within the petroleum exclusion and are excluded from CERCLA coverage. *Id.,* at 805.

The Plaintiffs discredit the holding of the *Wilshire Westwood* court as an "aberration" and invite the Court to disregard that decision as contrary to the "plain meaning" of Section 6907(14). However, the Court in *Wilshire Westwood* undertook its own thorough analysis and concluded that its interpretation does constitute the "plain meaning" of the words of the statute. *Id.,* at 803–805. Further, the court noted that its interpretation is fully consistent with the legislative history and EPA interpretation. *Id.,* at 805–810. Further, as noted, the *Wilshire Westwood* interpretation of the petroleum exclusion is consistent with other court interpretations.

The legislative purpose behind the petroleum exclusion is simply that Congress did not intend appropriated Superfund monies to be spent to clean up oil spills, and other releases of "strictly oil." *See, e.g., Exxon,*

744 F.Supp., at 490; *Wilshire Westwood,* 881 F.2d, at 805 n. 5. As applied to the instant case, the petroleum exclusion excepts this particular "spill" from CERCLA coverage because all available evidence suggests that what is at issue here is nothing more nor less than leaking gasoline. Consequently, the Court sees no inconsistency between *Wilshire Westwood* and the legislative purpose underlying the petroleum exclusion in § 9607(14), and the Court concludes that CERCLA is not applicable to the instant case.

## D. PLAINTIFFS' "CONTRIBUTION" CLAIM

▬ Emro argues that it cannot be held liable to the Plaintiffs under a "contribution" theory because the Plaintiffs have not themselves been found liable for any clean-up costs. Instead, all that has occurred here is Plaintiffs have *volunteered* to clean up the subject property solely to induce McDonald's to purchase it and the adjacent parcel for use as a restaurant. The crux of Emro's argument is that, since the Department of Natural Resources neither obtained a judgment of liability against the Plaintiffs nor ordered the Plaintiffs to clean up the property, the Plaintiffs' voluntary acts, done primarily to facilitate their private pecuniary interests, preclude their present contribution claims.

Under Michigan law, however, a "volunteer" is not defined so broadly. In *Detroit Automobile Inter–Insurance Exchange v. Detroit Mutual Automobile Ins. Co.,* 337 Mich. 50, 59 N.W.2d 80 (1953), the Michigan Supreme Court rejected the argument that the plaintiff insurance company's contribution claim against a co-insurer was barred by the first company's failure to wait until the insured individual sought and obtained a judgment against it before it paid on the claim. The defendant insurance company had made the same sort of "volunteer" argument that Emro makes here, and was answered by the Michigan Supreme Court as follows:

We shall first discuss defendant's motion for judgment of no cause of action on the pleadings. The basis of this mo-

tion is that plaintiff's declaration does not state a cause of action against defendant for the reason that plaintiff being a volunteer has no right to a contribution from defendant because of its payment of the judgment against Charles W. Hudson [the insured motorist]. For the purpose of deciding this motion, we shall assume that all facts pleaded in plaintiff's declaration are true. Plaintiff urges that because it paid the judgment against Charles W. Hudson, in the protection of its legitimate interests and by virtue of its obligation under the insurance contract, it is not a volunteer.

In 44 Words and Phrases, Volunteer, page 443, it is said:

> "A 'volunteer' is one who intrudes himself into a matter which does not concern him, or one who pays the debt of another without request, when he is not legally or morally bound to do so, and when he has no interest to protect in making such payment. *Missouri, K. & T. Ry. Co. of Texas v. Hood*, Tex. [Civ.App.], 172 S.W. 1120 [1915]."

In 50 Am.Jur. 698, it is said:

> "Where the person paying the debt has an interest to protect, he is not a stranger.
>
> "One is not a volunteer within the rule here considered where he pays the debt at the instance, solicitation, or request of the person whose liability he discharges, or of that person's agent or representative.
>
> "A payment is not voluntary when made under compulsion, under a moral obligation, in ignorance of the real state of facts, or under an erroneous impression of one's legal duty."

In the case at bar defendant insurance company was requested to defend the Hudson action and refused to do so.

Plaintiff insurance company, by and under its contract with Hudson, agreed to pay on behalf of Hudson all sums which Hudson should become legally obligated to pay because of bodily injury and property damage caused by accident arising out of the ownership, maintenance, or use of his automobile....

Plaintiff insurance company by paying the judgment [in favor of the injured third party] against Hudson performed the terms of its contract with Hudson and thereby became subrogated to the rights of Hudson. Under the provisions of the policies issued to Hudson, neither the plaintiff insurance company, nor the defendant insurance company was primarily liable for the entire amount of the loss. In our opinion plaintiff did not voluntarily pay the debt of defendant insurance company.

*Id.,* 59 N.W.2d, at 81–82.

In response to Emro's motion for summary judgment, the Plaintiffs assert that they are seeking contribution from Emro for having paid their potential joint liability under the Michigan Leaking Underground Storage Tank Act,[3] M.C.L. § 299.831, *et seq.,* as well as under Section 12 of Act No. 233 of the Michigan Public Acts of 1990. Accordingly, the Court will consider whether the Plaintiffs' actions in removing the contaminants from the property discharged a *potential* joint liability of the Plaintiffs with Emro such that the Plaintiffs would be entitled to bring a contribution action against Emro under Michigan law.

1. PLAINTIFFS' AND DEFENDANT'S POTENTIAL LIABILITY

The Plaintiffs argue that, under Section 12 of the Michigan Leaking Underground Storage Tank Act, M.C.L. § 299.842, the Plaintiffs and Emro are both "owners"[4] of the leaking underground storage tanks and are, therefore, jointly and severally liable

---

**3.** This Act is commonly known, and the parties refer to it, by the acronym "LUST."

**4.** Emro evidently would not be an "owner" of the underground storage tanks unless the release occurred at the time Emro or Checker Oil held title to the property. M.C.L. § 299.834(2) defines "owner" for the purposes of the Leaking

Underground Storage Tank Act and states, in pertinent part, as follows:

**299.834. Definitions**

\* \* \* \* \* \*

(2) "Owner" means a person who holds, or *at the time of the release* held, a legal, equitable, or possessory interest of any kind in an underground storage tank system, or in the

to clean up the contaminated soil caused by the leaking underground storage tanks. Section 299.842 reads, in pertinent part, as follows:

**299.842.  Liability of owners or operators**

Sec. 12.   (1)  Except as otherwise provided in this section, liability imposed upon an owner and operator under this act shall be strict and without regard to fault, as applied to either or both of the following:

(a) The obligation to carry out all corrective action[5] requirements pursuant to this act.

(b) Any liability for *other* relief provided in section 13(1) [M.C.L. § 299.-843(1)].

\*    \*    \*    \*    \*    \*

M.C.L. § 299.842(1).

Although this statute does not explicitly identify *to whom* the "owner and operator" shall be liable, Section 299.842(1)(b) and (by implication arising out of Section 299.-842(1)(b)'s use of the term "other relief provided in section 13(1)") Section 299.-842(1)(a) refer to the liability established by M.C.L. § 299.843 in favor of the Michigan attorney general, on behalf of the director of the Michigan Department of Natural Resources.  Section 299.843 authorizes the Michigan Attorney General to bring a civil action to enforce the Michigan Leaking Underground Storage Tank Act:

**299.843.  Civil actions for injunctions, costs, damages and fines**

Sec. 13.   (1) The attorney general may, on behalf of the director, commence a civil action seeking any of the following:

(a) A temporary or permanent injunction.

(b) Recovery of all costs incurred by the state for taking corrective action.

(c) Damages for the full injury done to the natural resources of this state along with enforcement and litigation costs incurred by the state.

(d) A civil fine of not more than $10,-000.00 ...

(e) A civil fine of not more than $25,-000.00 ...

(f) Recovery of funds provided to the state from the United States environmental protection agency's leaking underground storage tank trust fund.

(2) A civil action brought under subsection (1) may be brought in the circuit court for the county of Ingham, in the county where the release occurred, or in the county where the defendant resides.

(3) The state may, when appropriate, return to the United States environmental protection agency any federal funds recovered under this act.  The state may also retain any federal funds recovered under this act in a separate account for use in implementing this act with such use subject to approval of the United States environmental protection agency. M.C.L. § 299.843.

Read together, Section 299.842(1) and Section 299.843 create potential liability on the part of owners and operators to the Michigan Department of Natural Resources ("DNR").  Thus, the Court concludes that both the Plaintiffs and Emro were potentially liable to the DNR at the time the Plaintiffs conducted the clean-up, depending, in part, on whether the release

---

property on which an underground storage tank system is located ...
M.C.L. § 299.833 (emphasis added).
Under the facts stipulated by the parties in their proposed Joint Final Pretrial Order in this case, Emro assumed the liabilities of Checker Oil Company, which operated the gas station from 1977 through 1981, when Emro merged with Checker Oil in 1984.  However, it is still not determined whether the release occurred during Checker Oil's operation of the gas station, or when the gas station was operated by Exxon.

**5.**  "Corrective action" is defined in M.C.L. § 299.-833(1):

**299.833.  Definitions**
Sec. 3.  (1)  "Corrective action" means an action to stop, minimize, eliminate, or clean up a release or its effects, as may be necessary to protect the public health, safety, welfare, or the environment.  This includes, but is not limited to, release investigation, mitigation of fire and safety hazards, tank repair or removal, soil remediation, hydrogeological investigations, free product removal, groundwater remediation and monitoring, exposure assessments, the temporary or permanent relocation of residents, and the provision of alternate water supplies.
M.C.L. § 299.833(1).

occurred when Checker Oil Company operated the gas station.

This assumes, of course, that the release was of such a nature and extent as to be subject to action under LUST, a fact not made part of the evidentiary record. However, for purposes of this opinion, the Court will assume the release in question would have been subject to corrective action.

Further, the clean-up costs spent by the Plaintiffs do appear to have been incurred, at least in part, in satisfaction of their own potential direct liability to the Michigan Attorney General and DNR. For this reason, the Court cannot conclude, under the Michigan Supreme Court's analysis in *Detroit Auto*, that the Plaintiffs were mere "volunteers" when the conducted the clean-up.

However, it also appears that the clean-up was conducted at the request, and for the benefit, of McDonald's, to induce McDonald's to purchase the property, as well as the adjacent parcel, for use as a restaurant. Thus, it is possible that the Plaintiffs expended more than was strictly necessary to discharge their potential joint liability, with Emro, to the DNR. Moreover, the possibility that the Plaintiffs mitigated their damages as a result of the increase in the value of both parcels transferred to McDonald's may further reduce their right to recover against Emro. These questions raise important factual issues which would normally have to be determined at trial. Ultimately, however, the fact that the Plaintiffs conducted the clean-up without the compulsion of a prior court judgment or order from the DNR does not, under Michigan law, wholly preclude their right to obtain contribution from Emro.

### 2. EFFECT OF THE PARTIES' CONTRACTUAL PROVISIONS

At the May 14, 1991 hearing, the Court specifically requested the parties to file supplemental briefs addressing whether the provisions in Paragraphs 10 and 11 of the March 1987 purchase contract (see pp. 2–3, *infra*) are effective to release Emro from any rights to contribution the Plain-

tiffs may otherwise possess with respect to the Michigan Leaking Underground Storage Tank Act. This issue has now been fully briefed by the parties.

Paragraph 11 of the purchase contract explicitly states, "Buyer acknowledges that he has inspected and is familiar with the condition of the property; that Seller has not made and makes no warranties or representations as to the condition of said property, including, but not limited to, *soil conditions,* ... [and] *that he assumes all responsibility for any damages caused by the conditions on the property upon transfer of title*" (emphasis added). Emro argues that this language in the parties' agreement effectively releases Emro from liability to the Plaintiffs with respect to damages incurred by the Plaintiffs as a result of the soil conditions on the property, including the presence of hazardous substances caused by oil leaking from the underground storage tanks.

In response, the Plaintiffs argue: (1) the contract language is merely a warranty disclaimer and does not purport to release Emro from its statutory liability to the Plaintiffs under the Michigan Leaking Underground Storage Tank Act; and (2) even if the contract could be construed to release Emro from the Plaintiffs' claim under the Michigan Act, the contract is nevertheless unenforceable under Section 12(6) of the Act, M.C.L. § 299.842(6).

#### a. Does the Contractual Language Release Emro from its Statutory Liability to the Plaintiffs?

■ In their supplemental brief, the Plaintiffs argue, first, that above-quoted provision in the purchase contract merely constitutes a warranty disclaimer and, as such, bars only the Plaintiffs' claims against Emro based upon breach of warranty. The Plaintiffs rely on *Southland Corp. v. Ashland Oil Co.*, 696 F.Supp. 994, 1000 (D.N.J.1988) and *Channel Master Satellite Systems v. JFD Electronics Corp.*, 702 F.Supp. 1229 (E.D.N.C.1988), in support of this argument.[6] However, there are significant differences between the contract language analyzed by the courts in

---

**6.** *See also Wiegmann & Rose International Corp. v. NL Industries,* 735 F.Supp. 957, 962 (N.D.Cal. 1990).

*Southland* and *Channel Master* and the contract language at issue in the instant case.

In *Southland,* the court stated:

Ashland [the seller of the contaminated property] argues that because the term "as is" negates any representation on the part of the seller with regard to warranty or guarantee, this somehow conveys the idea that the purchaser assumes *all* of the associated risks. This argument is unpersuasive. As Southland correctly notes, an "as is" provision is merely a warranty disclaimer and as such precludes only claims based on breach of warranty. It does not act to shift liability from one party to an agreement to another and is inapplicable in a cause of action which is not based on breach of warranty. Therefore, *standing alone,* the "as is" clause cannot defeat Southland's CERCLA claims.

*Southland,* 696 F.Supp., at 1001 (emphasis added) (citations omitted).

Similarly, the contract at issue in *Channel Master* stated, in pertinent part:

4.4 Buyer represents that it has inspected, examined and investigated the Property and the uses thereof to its satisfaction, that it has independently investigated, analyzed, and appraised the value and the profitability thereof and that, except as expressly provided in this contract, it is purchasing the Property "as is" at the date of this contract and at the Closing.

*Channel Master,* 702 F.Supp., at 1230. With respect to the legal effect of this clause, the *Channel Master* court said:

As indicated in *Southland,* the "as is" clause does not shift affirmative obligations of the parties imposed by statute independent of the contract. It is applicable only to rights arising by the dealings of the parties *inter se,* and hence is no bar to Channel Master's claim predicated upon § 107(a)(2) of CERCLA.

*Id.,* at 1232.

In both the cited cases, it is clear that the courts were construing the legal effect of the "as is" provision standing alone. *See Southland,* 696 F.Supp., at 1001. However, in the instant case, it is not the "as is" clause standing alone which purports to release Emro. Rather, the provision in the contract that states, "Buyer acknowledges ... that he assumes all responsibility for any damages caused by the conditions on the property upon transfer of title," releases Emro from liability to the Plaintiffs under the Michigan Act. This language contemplates not only that the Plaintiffs waive their claims against Emro for damages "caused by the conditions on the property," but, further, that the Plaintiffs assume the risk of damages to third parties "caused by the conditions on the property."

In this respect, as between Emro and Plaintiffs, the *assumption* language in the instant contract is effective to encompass both damages claims brought by third parties and the Plaintiffs' claim for reimbursement of statutory clean-up costs. *FMC Corp. v. Northern Pump Co.,* 668 F.Supp. 1285, 1291 (D.Minn.1987); *United States v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 1011, 1012 (D.S.C.1984). Therefore, the Court rejects the Plaintiffs' argument that the language in Paragraph 11 of the purchase contract purports to waive only breach of warranty claims.

#### b. Is the Contract Enforceable Under Michigan Law?

The Plaintiffs argue, in the alternative, that Section 12(6) of the Michigan Leaking Underground Storage Tank Act renders unenforceable Emro's attempt, in the purchase contract, to absolve itself from potential liability to the Plaintiff under the Act. Sections 12(6) and (7) (also pertinent) of the Michigan Act provide:

**299.842. Liability of owners or operators**

\*    \*    \*    \*    \*    \*

(6) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator or from any person who may

be liable for a release or threat of release under this act, to any person the liability imposed under this act. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this act.

(7) This act shall not bar a cause of action that an owner or operator or any other person subject to liability under this act, or a guarantor, has or would have by reason of subrogation or otherwise against any person.

M.C.L. § 299.842(6), (7).

As noted by the parties in their supplemental briefs, this statute was enacted by the Michigan legislature effective January 19, 1989 and has not received any interpretation or construction by a Michigan or federal court. However, the parties further note that Sections 12(6) and (7) are virtually identical to, and obviously based upon, the analogous provisions contained in Sections 107(e)(1) and (2) of CERCLA, 42 U.S.C. § 9607(e)(1), (2). This statute reads in relevant part as follows:

### § 9607. Liability

     *     *     *     *     *     *

(e) Indemnification, hold harmless, etc., agreements or conveyances; subrogation rights

(1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for liability under this section.

(2) Nothing in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

42 U.S.C. § 9607(e)(1), (2).

The first rule in the construction of any statute is to begin with the language of the statute itself. *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Mallard v. United States District Court for the Southern District of Iowa,* 490 U.S. 296, 109 S.Ct. 1814, 1818, 104 L.Ed.2d 318 (1989). "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'" *Ron Pair,* 109 S.Ct., at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *Bradley v. Austin,* 841 F.2d 1288, 1293 (6th Cir.1988).

At first glance, the first and second sentences of Section 107(e)(1) may appear to be contradictory. Read cursorily, the first sentence seems to proscribe indemnification and hold harmless agreements, and the second sentence seems to permit them. In fact, a number of federal courts addressing this issue have found that the second sentence nullifies the first.[7] However, these courts seem to have predicated their decisions on the public policy rationale that, because CERCLA liability is far reaching, the parties should be able to distribute it as they see fit. 750 F.Supp. at 1025–26.

In interpreting this section, this Court will begin with the understanding that Congress intended that liability under CERCLA be joint and several. All parties who qualify as owners or operators are to be

---

7. As stated by the court in *Jones–Hamilton Co. v. Kopcoat, Inc.,* 750 F.Supp. 1022 (N.D.Cal.1990),

    A majority of federal courts that have considered the issue have held with minimal discussion that the second sentence of section 107(e)(1) completely negates the first sentence, thereby permitting parties to bargain over indemnification for CERCLA liability under all circumstances. *See e.g., American Nat'l Can Co. v. Kerr Glass Mfg. Corp.,* 1990

WL 125368, 1990 U.S.Dist. LEXIS 10999, p. 32 (N.D.Ill.1990); *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563 (E.D.Pa.1988); *Chemical Waste Management v. Armstrong World Indus., Inc.,* 669 F.Supp. 1285, 1293 (E.D.Pa. 1987); *FMC Corp. v. Northern Pump Co.,* 668 F.Supp. 1285, 1289 (D.Minn.1987), appeal dismissed, 871 F.2d 1091 (8th Cir.1988).

*Id.* at 1025.

held liable to the claimant.[8] As noted in the legislative history,

> The Committee fully subscribes to the reasoning of the court in the seminal case of *United States v. Chem–Dyne Corporation*, 572 F.Supp. 802 (S.D.Ohio 1983), which established a uniform federal rule allowing for joint and several liability in appropriate CERCLA cases.

H.R.Rep. No 99–253(I), 99th Cong., 1st Sess. 74, *reprinted in* 1986 U.S.CODE CONG. & ADMIN.NEWS 2835, 2856.

The first sentence of Section 107 clearly assumes the joint and several liability of all liable parties to any party that, under the Act, has a right to demand cleanup and redress of damages, e.g., the government. It is this joint and several liability to which Congress is clearly referring when it speaks of "the liability imposed under this section" in the last words of the first sentence of the section.

With this premise firmly in mind, the first and second sentences of Section 107(e)(1) are not contradictory, but rather clear in their scope and intent. The first sentence simply voids any attempted transfer of joint and several liability to another party. Thus, assuming that Party A is the government and Party B is an owner-operator who sells property to Party C, the clear intent and effect of the first sentence is to void any attempt by Party B to contractually transfer, through indemnification or hold harmless agreements, to Party C all the liability it owes Party A. In other words, Party B cannot, by contractual indemnification, escape its obligations to Party A under the Act. Congress intended to protect the rights of the claimant against attempts by owners or operators to escape liability to claimants through private contractual devices. *See Rodenbeck v. Marathon Petroleum Co.*, 742 F.Supp. 1448, 1456 (N.D.Ind.1990).

The legislative history of CERCLA provides clear support for this interpretation.

During a Senate debate, the following exchange took place between Senator Cannon and Senator Randolph, a sponsor of the bill:

> Mr. CANNON. Section 107(a)(1) prohibits transfer of liability from the owner or operator of a facility to other persons through indemnification, hold harmless, or similar agreements or conveyances. Language is also included indicating that this prohibition on the transfer of liability does not act as a bar to such agreements, in particular to insurance agreements.
>
> The net effect is to make the parties to such an agreement, which would not have been liable under this section, also liable to the degree specified in the agreement. *It is my understanding that this section is designed to eliminate situations where the owner or operator of a facility uses its economic power to force the transfer of its liability to other persons, as a cost of doing business, thus escaping its liability under the act all together [sic].*
>
> Mr. RANDOLPH. That is correct.

126 CONG.REC. 30,984 (1980) (emphasis added). Senator Cannon makes clear that the purpose of the section is to ensure that the responsible parties will fund the cleanup. These responsible parties may enter insurance agreements to add parties who will pay for the cleanup. They may not, however, avoid liability to the claimant (usually the government) by transferring this liability.

There is nothing in the first sentence that purports to prevent liable parties under the Act from apportioning, allocating, or even shifting completely *among themselves* the liability that each party will owe the CERCLA claimant, so long as each contracting party understands that it will remain jointly and severally liable to that

---

**8.** As defined in CERCLA, "claimant" is "any person who presents a claim for compensation under this chapter." 42 U.S.C. § 9601(5). In most cases, the United States government, operating through the Environmental Protection Agency, will be enforcing the statute. However, the Act also provides for recovery, under certain conditions, by private parties. *See* 42 U.S.C.

§ 9607(a)(4)(B); *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 2285, 105 L.Ed.2d 1 (1989); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667 (5th Cir.1989).

The Michigan statute likewise assumes that the state government, i.e., the DNR, will be responsible for collecting response costs for hazardous waste cleanup. See M.C.L. § 299.843.

CERCLA claimant. An interpretation to the contrary would effectively burden all contractual exchanges involving property that may fall under CERCLA's purview. This was not Congress's intention. *See Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1460 (9th Cir.1986).[9] Rather, Congress passed CERCLA to ensure that the responsible parties, and not the government, would ultimately pay for waste cleanup.[10]

The second sentence of Section 107(e)(1) clarifies and reinforces the scope of the prohibition in the first sentence. It notes that the first sentence will not prohibit agreements between parties to insure, indemnify, or hold harmless: "Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section." 42 U.S.C. § 9607(e). Read in conjunction with the first sentence, insurance, indemnification, or hold harmless agreements are valid so long as they do not transfer liability from an owner or operator to a third party. Thus, Party C may indemnify or insure Party B because this indemnification will not jeopardize Party A's ultimate ability to collect the costs of cleanup. The liability remains with the transferor; the transferee simply agrees to fund the cleanup on behalf of the transferor.

Section 107(e)(2) lends even further support to this interpretation. It reads in pertinent part:

(2) Nothing in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

42 U.S.C. § 9607(e). This section would permit parties to bring an action to enforce their rights of subrogation (i.e., their contractual rights to indemnification or contribution) notwithstanding the provision of Section 107(e)(1). Thus, if a party that has indemnified or insured himself against liability is sued by a CERCLA claimant, that party may recover from the other party to the agreement. This language ensures that Section 107(e)(1) will not be interpreted to abrogate such contractual agreements.

In reaching this conclusion, the Court finds persuasive the analysis of Section 107 adopted by the Ninth Circuit in *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454 (9th Cir.1986). In that case, Mardan Corporation ("Mardan") bought from Macmillan, Inc. ("Macmillan") a plant used to make musical instruments. For ten years prior to the sale, Macmillan had manufactured instruments at the plant and had deposited waste into a settled pond at the site. Prior to the sale of the plant, Macmillan filed with the EPA a Notification of Hazardous Waste Activity. Later, the parties executed an "Agreement of General Settlement and Release" under which Macmillan paid Mardan $995,000 in settlement of a variety of claims arising out of the purchase. The language of the settlement agreement encompassed "all actions, causes of action, suits, ... based upon, arising out of or in any way relating to the Purchase Agreement...." *Mardan*, 804 F.2d at 1456. Later, the EPA brought suit against Mardan and, pursuant to a consent agreement, Mardan agreed to clean up and close the settling pond. Mardan then brought an action under Section 107 of

---

**9.** The *Mardan* court touched upon this issue in a CERCLA case involving facts similar to those before the Court in the instant case:

> By contrast, nothing in CERCLA suggests that it was intended to offer special protection to unwary purchasers of businesses. Moreover, since CERCLA releases are likely to be entered into by major companies, there is little need for a special federal rule to protect releasors of CERCLA recovery rights from their own ignorance or weak bargaining power. In fashioning a statute to further a federal interest, Congress seldom if ever intends to pursue that interest at any cost. Rather Congress seeks to balance that interest against

countervailing considerations, such as the utility of indemnification agreements, which it recognized in section 107(e)(1).

*Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1460 (9th Cir.1986) (Footnote omitted).

**10.** *See* H.R.Rep. No. 99–253(I), 99th Cong., 2nd Sess. 55, *reprinted in* 1986 U.S.CODE CONG. & ADMIN.NEWS 2835, 2837 ("As a result, an underlying principle of H.R. 2817 is that Congress must facilitate cleanups of hazardous substances by the responsible parties while assuring a strong EPA oversight role with a set of tough legal enforcement standards").

CERCLA seeking to recover damages for costs incurred in cleaning up the pond.

The district court granted summary judgment to Macmillan on the ground[11] that Mardan's action under Section 107 of CERCLA was barred by the terms of the release executed as part of the settlement agreement. *Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049 (D.Ariz.1984). The Ninth Circuit affirmed stating:

> Contractual arrangements apportioning CERCLA liabilities between private "responsible parties" are essentially tangential to the enforcement of CERCLA's liability provisions. Such agreements cannot alter or excuse the underlying liability, but can only change who ultimately pays that liability. Moreover, regardless of how or under what law these agreements are interpreted, the result cannot prejudice the right of the government to recover cleanup or closure costs from any responsible party, including either Mardan, Macmillan, or both. CERCLA § 107(a), 42 U.S.C. § 9607(a) (1982).

*Mardan*, 804 F.2d at 1459.

The Ninth Circuit's interpretation of the intersection between contractual and CERCLA liability was not followed, however, by the Northern District of Ohio in *AM International, Inc. v. International Forging Equipment*, 743 F.Supp. 525 (N.D.Ohio 1990).[12] That court relied on legislative history to formulate a different interpretation of the statute. It noted that one prior draft of Section 107 read as follows:

> No indemnification, hold harmless, conveyance, or similar agreement shall be effective to transfer from the owner or operator of a facility, or from any person who may be liable for a release under this section, to any other person the liability imposed under this section: *Provided*, That this subsection shall not apply to a transfer in a bona fide conveyance of a facility or site (1) between two parties not affiliated with each other in any way, (2) where there has been an adequate disclosure in writing ... of all facts and conditions (including potential economic consequences) material to such liability, and (3) to a [transferee] who can provide assurances of financial responsibility and continuity of operation consistent with the degree and duration of risks associated with such facility or site.

S. 1480, 96th Cong., 2d Sess., 126 CONG. REC. 30,900 (1980). This draft was, however, later changed to the present version by excising the exception to the prohibition on the transfer of liability.

From this, the *AM International* court concluded that the section as now drafted precludes all attempts contractually to relieve parties of liability under the Act with a single exception "recognizing agreements that may provide for indemnity or additionally liable parties." *AM International*, 743 F.Supp. at 528–29. This Court respectfully disagrees with the interpretation of Section 107 chosen by the *AM International* court. It believes that that court failed adequately to take into consideration the difference between a *transfer* of liability and an agreement for indemnification or contribution between parties otherwise liable to the government. It made the erroneous assumption that simply because Congress had prohibited the release of liability to the claimant, it had also forbade the release of liability to another liable party.

The prior draft proves only that Congress earlier considered allowing the transfer of liability under limited circumstances. With the exception of clause (2) of the draft legislation,[13] the conditions set forth in this prior draft were clearly inserted to protect the recovery rights of the principal CERCLA claimants under the Act. Clause (1) protects innocent claimants against sham transactions between insiders merely intended to insulate potential "deep pockets"

---

**11.** As an alternative ground, the court held that Mardan's action was barred by the doctrine of unclean hands.

**12.** The Court notes that the *AM International* decision has since been followed by the United States District Court for the Western District of Michigan in *CPC Intern., Inc. v. Aerojet–General Corp.*, 759 F.Supp. 1269, 1282–1283 (W.D.Mich. 1991).

**13.** The purpose of clause (2) seems to be directed at protecting the person who assumes liability. However, this protection was not carried forward in the version of Section 107(e)(1) that was ultimately enacted.

from CERCLA liability. Similarly, clause (3) of the draft allows a responsible owner or operator to transfer liability only if the proposed transferee is financially capable of responding in damages to claimants. These protections were thought necessary only because Congress evidently believed that, in the absence of Section 107(e)(1), potentially responsible owners and operators would have been able to escape CERCLA liability simply by transferring the liability to others.[14]

Thus interpreted, there is nothing "internally inconsistent" or contradictory between the first and second sentences of Section 107(e)(1) which would lend ambiguity to the plain language used in the first sentence.

Consequently, this Court concludes that Section 107(e)(1), 42 U.S.C. § 9607(e)(1), and, by analogy, the identical provision of LUST, M.C.L. § 299.842(6) and (7) which are here being construed, is unambiguous. Since there is no clear legislative intent to the contrary disclosed in the legislative history, the Court will enforce the Michigan statute according to the "plain meaning" of the words chosen by the legislature. *Ron Pair*, 109 S.Ct. at 1031. In this case, this means that the terms of Paragraph 11 of the purchase contract are enforceable. Therefore, as between Emro and themselves, the Plaintiffs have released Emro from liability arising out of the condition of the property at the time of the sale, including the "soil condition," and this release bars the Plaintiffs' claim under the Michigan Leaking Underground Storage Tank Act.

## E. MICHIGAN ENVIRONMENTAL PROTECTION ACT

■ Emro argues that the Plaintiffs' claim under the Michigan Environmental Protection Act, M.C.L. § 691.1201, *et seq.*, should be dismissed because the Michigan act provides for only injunctive and declaratory relief, and the "Complaint is clearly seeking money damages." The Plaintiffs attempt to answer this argument with reference to the First Amended Complaint itself, wherein the Plaintiffs state, "Plaintiffs pray that this Honorable Court grant whatever declaratory and/or equitable relief is deemed appropriate, together with interest, costs and attorneys' fees and such other relief as the Court deems just under the circumstances."

However, in this Court's view, FED. R.CIV.P. 8(a)(3) [15] requires something more in the way of specificity when the Plaintiff seeks declaratory and injunctive relief. The purpose of Rule 8(a)(3) is to provide the defendant with adequate notice of what relief is sought. *Bartz v. Carter*, 709 F.Supp. 827, 829 (N.D.Ill.1989). The general request for relief in the First Amended Complaint fails to provide adequate notice of what sort of declaratory and equitable relief the Plaintiffs seek from Emro. Even the "Plaintiffs' Claims" section of the parties' proposed Joint Final Pretrial Order fails to specify more than that the "Plaintiffs have requested injunctive relief against Defendant pursuant to the Michigan Environmental Protection Act...."

More fundamentally, though, the Plaintiffs no longer have standing to require Emro to take further action with respect to the real property involved here because the Plaintiffs sold the property and the adjacent parcel to McDonalds back in 1989. Article III of the United States Constitution restricts this Court's jurisdiction to actual cases and controversies between persons with an actual stake in the outcome. *Allstate Ins. Co. v. Wayne County*, 760 F.2d 689, 692 (6th Cir.1985).

Courts do not decide cases based on the rights of third parties because it may be

---

14. The perceived need for such protection also explains Senator Cannon's remark concerning the present version of Section 107(e)(1): "It is my understanding that this section is designed to eliminate situations where the owner or operator of a facility uses its economic power to force the transfer of its liability to other persons, as a cost of doing business, thus *escaping its liability under the act all together.*" 126 Cong.Rec. 30,984 (1980) (emphasis added). *See AM International*, 743 F.Supp. at 529.

15. **Rule 8. General Rules of Pleading**

(a) Claims for Relief. A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain ... (3) a demand for judgment for the relief the pleader seeks. FED.R.CIV.P. 8(a)(3).

that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not, and third parties themselves usually will be the best proponents of their own rights. However, a party will be allowed to assert the rights of third persons where practical obstacles prevent a party from asserting rights on behalf of itself. . . .

*Id.,* at 693.

There simply are no "practical obstacles" in the instant case which would prevent McDonalds from asserting its own rights to injunctive relief with respect to the contaminated property. Therefore, the Court must dismiss the Plaintiffs' claim for injunctive relief.

## F. NEGLIGENCE, NUISANCE, AND TRESPASS CLAIMS

■ Emro argues that the Plaintiffs' claims for negligence (Count VI), Nuisance (Count VII), and Trespass (Count VIII) must all be dismissed because the available evidence demonstrates no connection between the contaminants found on the property in 1989 and the conduct of Emro and its predecessor in interest, Checker Oil Co., in operating the gas station from 1974 through 1981. In support of this argument, Emro has provided the Court with a small sample of the deposition testimony of Willis Deetz, the individual who actually operated the station during this time, to the effect that his periodic comparison of the "stick measurement" of the amount of gas stored in the storage tanks to the amount that was sold through the pumps showed that there was never any leakage. However, as the Plaintiffs point out in their response brief, Mr. Deetz further testified at his deposition that it was not unusual for there to be a 20–gallon discrepancy between the pump records and physical measurements. In light of this testimony, the Court cannot conclude that there is no evidence of leaking during the time Emro and Checker Oil operated the station. Therefore, the asserted lack of evidence of leakage during Checker Oil's operation of the station does not constitute sufficient

grounds for the dismissal of Counts VI–VIII of the First Amended Complaint.

However, the Court concludes that these claims must nevertheless be dismissed because the Plaintiffs have waived those claims. Paragraph 11 of the purchase contract signed by the Plaintiffs states as follows:

11. Buyer acknowledges that he has inspected and is familiar with the condition of the property; that Seller has not made and makes no warranties or representations as to the condition of said property, including, but not limited to, *soil conditions,* zoning, building code violations, building line, building construction, use and occupancy restrictions (and violations of any of the foregoing), availability of utilities; and that Buyer is purchasing the same "as is"; *that he assumes all responsibility for any damages caused by the conditions on the property upon transfer of title* (emphasis added).

It is clear that the Plaintiffs' claims in Counts VI–VIII of the First Amended Complaint constitute claims for "damages caused by the conditions on the property upon transfer of title." Even the Plaintiffs' claims arising from the spread of contamination to the adjacent parcel are claims for "damages caused by the conditions on the property upon transfer of title," since the contamination of the adjacent parcel was allegedly caused by the contamination on the Emro site. Consequently, the Court will dismiss Counts VI–VIII of the First Amended Complaint for this reason.

CONCLUSION:

For the reasons stated herein, and the Court being otherwise fully advised in the premises;

NOW, THEREFORE;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Defendant's Motion for Summary Judgment is GRANTED, and the First Amended Complaint shall be and hereby is DISMISSED WITH PREJUDICE.

LET THE JUDGMENT BE ENTERED ACCORDINGLY.